[No. B032783. Second Dist., Div. Four. Mar. 16, 1989.]

PAUL L. NEWMAN et al., Plaintiffs and Respondents, v. FRANCHISE TAX BOARD, Defendant and Appellant.

COUNSEL

John K. Van de Kamp, Attorney General, Edmond B. Mamer and Richard E. Nielsen, Deputy Attorneys General, for Defendant and Appellant.

Mitchell, Silberberg & Knupp, Russell J. Frackman and Mitchell M. Gaswirth for Plaintiffs and Respondents.

OPINION

GOERTZEN, J.—After a court trial, based on a stipulation of facts (Code Civ. Proc., § 283) and numerous exhibits, the trial court found in favor of plaintiffs/respondents Paul L. Newman and Joanne W. Newman and against defendant/appellant Franchise Tax Board (the Board). The Board appeals; it contends that the court erred when it determined the allocation formula to be applied between California and non-California sources of the Newmans' acting income from the motion picture, "The Sting"; and when it found that the Newmans had given legally sufficient notice to the Board of their claim for a refund for a portion of their 1975 taxes.

FACTS

The facts in this case are uncontroverted. The stipulation of facts and other exhibits contained all the facts before the trial court and may be summarized as follows:

Plaintiff Paul L. Newman (Newman) is an actor. He and his wife, Joanne W. Newman, are not California residents. Ms. Newman is a plaintiff be-

cause the dispute concerns California joint nonresident income tax returns filed by the Newmans, as husband and wife, for 1975, 1976 and 1977.

In October 1972, Newman entered into a "deal-player contract" with Universal Pictures for the motion picture, "The Sting." Among other things, the contract provided that Newman was committed to Universal on an exclusive basis for a period not less than 11 weeks, commencing January 29, 1973, for the time required by Universal to complete the motion picture; Newman was absolutely prohibited from accepting any other employment "of any kind" during the entire 11-week exclusive contract period; Newman was obligated to perform services for Universal on an "on-call" basis, for which he was required to report promptly whenever and wherever Universal required or desired; Newman was to be paid a salary each week during the contract period, regardless of the number of days of actual filming during any particular week; Universal had the right to elect not to use Newman's services at all but was still required to pay him 11 weeks' compensation.

Newman's contract with Universal bound him to exclusive services from January 29, 1973, through April 13, 1973. The contract period encompassed 54 weekdays, excluding one legal holiday. Newman was physically present in California on 30 of the 54 days. He spent the remaining 24 days outside California. The fifty-four days can be summarized as follows: Newman travelled from his home in Chicago on one day; he was required to be on location in Chicago for two days; he travelled from Chicago to California on one day; he was on location in California for twenty-five days; he was in California for five days during which he was "on-call" but not performing; he spent nineteen days outside of California "on-call" but not performing; and he travelled from Los Angeles to his home on one day.

In filing their tax return for 1975, the Newmans allocated their income from "The Sting" using a denominator of 30 (days in California) and the numerator of 25 (days filming), 25/30 or 83.33 percent of the income. For the years 1976 and 1977, the Newmans allocated "The Sting" income using a numerator of 30 (days in California) and a denominator of 54 (total contract days), 30/54 or 55.56 percent of the income.[1] The Board rejected the Newmans' allocation and excluded all travel days and days of exclusivity and included only the days on which Newman was called to work for actual filming. Since he was called to work for filming during 27 days of the contract (25 in California and 2 in Chicago) and worked in California on 25 days, the Board allocated to California 92.59 percent (25/27) of the Newmans' gross income from "The Sting."

---

[1] The income relating to "The Sting" during the years in question stems from the percentage of profits that Newman shared in from the motion picture.

## Procedural History

The Newmans protested the Board's notices of proposed assessment. The Board revised its assessments, affecting matters other than "The Sting" issue, and issued its Notices of Action, consistent with its earlier determination. On August 26 and October 11, 1983, the Newmans paid the revised respective deficiencies, related to "The Sting," in the following amounts: 1975—$24,639; 1976—$7,336.48; and 1977—$8,938.04.

On March 5, 1984, the Newmans filed claims for refund (amended returns for the years 1975, 1976 and 1977) on the ground that their tax was determined under an inappropriate formula. The Board failed to take action on these claims for refund within six months.

The Newmans filed their complaint for refund on September 7, 1984. In addition to their "allocation" argument, the Newmans alleged that a May 14, 1982, letter to the Board was a claim for refund related to the overpayment on the return for 1975.

The court accepted the Newmans' allocation formula, finding that "the defendant Franchise Tax Board's position as to plaintiffs' claim for refund is neither fair nor reasonable." The court also found that with respect to the 1975 claim for refund, a timely claim was made, and thus "reject[ed] defendant's position that no claim was properly filed or that [the Board] did not have statutory notice."[2]

## Issues on Appeal

On appeal, we are asked to determine the appropriate method of allocating Newman's income from the film, "The Sting"; and whether the May 14,

---

[2] In its Statement of decision, the court offered the following rationale for its decision: "Cal. Rev. And Tax. Code § 17954 requires an allocation of a nonresident's income based upon the portion of income attributable to California sources. Defendant's Regulation 17951-5(b) provides that the allocation percentage is determined by comparing the total number of working days employed in California to the total number of working days both within and without California. [¶] The allocation formula here must include the entire 54-day contract period. Under Plaintiff Paul Newman's contract with Universal, he was exclusive to this employer and 'on call' at such employer's discretion. (The parties stipulated that this exclusive contract period encompassed 54 days.) He was required to report promptly whenever and wherever Universal required or desired. He was therefore compensated by such employer for each day in this 54-day period without regard to the activity engaged in by him on any particular day. The fact that Plaintiff may have engaged in activities outside of California during this period is irrelevant. He could have spent any of such days within or without California, subject only to his employer's discretionary authority to direct him to perform services at the times and places of such employer's choosing. Plaintiffs' income for this period is attributable to California only to the extent he was in California during this period."

1982, letter constitutes a claim for refund for amounts paid by the Newmans with their 1975 return relating to income from "The Sting."[3]

## STANDARD OF REVIEW

As this case was submitted on a stipulation of facts with documents, no evidentiary conflicts were created. ■ Consequently, we examine the stipulation and may make our own conclusions and findings. (*Oliver & Williams Elevator Corp.* v. *State Bd. of Equalization* (1975) 48 Cal.App.3d 890, 894 [122 Cal.Rptr. 249].) ■ To the extent that the court drew certain inferences from the evidence, however, this evidence shall be viewed in the light most favorable to the judgment. (*McKinney* v. *Kull* (1981) 118 Cal.App.3d 951, 955 [173 Cal.Rptr. 696].)

## DISCUSSION

*Method of Allocation.* Gross income in the case of a nonresident taxpayer includes only the gross income from sources within this state. (Rev. & Tax. Code, § 17951.)[4] ■ "The word 'source' conveys the essential idea of origin. . . . It is the place where the services are actually performed." (*Appeal of Rule* (1976) 1971-1978 CCH Cal. State Tax Rptr. ¶ 205-544.) Where a nonresident taxpayer has gross income from sources both within and without this state, his or her gross income will be allocated and apportioned. (§ 17954.) The definition of gross income includes compensation for services. (§ 17071, subd. (a)(1).) "Nonresident actors, singers, performers, entertainers, wrestlers, boxers, etc., must include in gross income as income from sources within this State the gross amount received for performances in this State." (Cal. Code Regs., tit. 18, § 17951-5, subd. (a)(2).) If a nonresident taxpayer is employed in this state at intervals during the year, compensation received for personal services "includes that portion of the total compensation for personal services which the total number of working days

---

[3] The following table summarizes the parties' respective allocations:

| | In Cal. | Outside Cal. | Travel | Total K Period |
|---|---|---|---|---|
| Filming Days | 25 | 2 | — | 27 |
| On Call Days | 5 | 19 | — | 24 |
| Travel Days | — | — | 3 | 3 |
| | 30 | 21 | 3 | 55 |

*The Newmans' Allocation*: Newman's California Days divided by Total Exclusive Contract Days (30/54) = 55.56 percent

*The Board's Allocation*: Newman's California Filming Days divided by Newman's Total Filming Days (25/27) = 92.59 percent

[4] All statutory references are to the Revenue and Taxation Code unless otherwise indicated.

employed within the State bears to the total number of working days both within and without the State." (Cal. Code Regs., tit. 18, § 17951-5, subd. (b).)

 Resolution of this appeal hinges on our determining what constitutes "working days" for Newman. We are in accord with the trial court's ruling that under Newman's contract, he was exclusive to his employer and "on call" at such employer's discretion. Consequently, the correct allocation formula is one which divides Newman's working days in California (30) by his total contract days (54).

This conclusion finds support in the Board's own rulings regarding allocation of an athlete's income. The Board objects to applying its "athlete" ruling to an actor. This objection is not well taken because the Board's own regulation, as found in the California Code of Regulations and quoted above, places nonresident actors in the same class as athletes.

As to athletes, the Board issued an audit ruling, AR-125.1, in which it created the concept of "duty days" as the basis for allocation. Under this analysis, all days during a professional athlete's entire season constitute "duty days." Duty days are not limited only to days when the taxpayer plays in a game but include "all days from the beginning of official pre-season training through the last game in which the team competes, including post-season games occurring in the taxable year." This ruling was approved in *Appeal of Carroll,* 1987 CCH Cal. State Tax Rptr. ¶ 401-505. In *Carroll,* the taxpayer was a professional basketball player employed by a California-based team. The taxpayer allocated to California a portion of his income according to the ratio of games played in California to the total number of games played during the season. The Board rejected the taxpayer's allocation and instead imposed an allocation which considered the total number of days in the relevant employment period. The Board argued that the taxpayer's "duty days" included all days from the beginning of team training through the end of the season. The Board's allocation was unconcerned with whether the taxpayer actually performed services for the team on each such day. The State Board of Equalization held that "[t]he term 'working day,' . . . includes all days on which the player's team practices, travels, or plays, beginning with the first day of the club's training sessions and extending through the team's last game." (*Appeal of Carroll, supra.*) It concluded that the correct allocation formula would relate the number of duty days spent in California to the total duty days during the season. (*Ibid.*)

 The applicability of this ruling to the instant appeal is obvious. Here, Newman's exclusive contract period is the "season" or the relevant

employment period, and Newman is the "player." The "duty days" have been defined by the contract, under the terms of which he was exclusive to this employer and "on call" at the employer's complete discretion. Newman was required to report promptly whenever and wherever Universal required or desired and was compensated for each day in the 54-day period without regard to the activity engaged in by him on any particular day. We hold that Newman's "duty days" in California are those during which he was either filming or "on call."

■ The validity of our conclusion is further confirmed by reference to directly analogous federal income tax law, which we will consider on comparable issues. (*Andrews* v. *Franchise Tax Board* (1969) 275 Cal.App.2d 653, 658 [80 Cal.Rptr. 403].) Section 861 of the Internal Revenue Code (26 U.S.C. § 861) requires allocation of income of nonresidents between United States and foreign sources. The Treasury regulations promulgated under section 861 and the federal cases interpreting this section have adopted the same definitions, with varying terminology, and allocation formula as we have here. (See *Stemkowski* v. *C.I.R.* (2d Cir. 1982) 690 F.2d 40, 44-46; 26 C.F.R. § 1.861-4(b)(1), example 1, p. 102, revised Apr. 1, 1988.)

*Notice of Claim for Refund.* The trial court found that the Newmans had filed a proper claim for refund for the 1975 tax year and that the Board had the requisite statutory notice of the claim. ■ The Board asserts that the Newmans have not stated a cause of action for a refund of a portion of the taxes they paid with their 1975 return because they failed to comply with the claim filing requirements of Section 19083. The parties agree that, given the procedural history of this case, the relevant date by which the Newmans should have filed a claim for refund is June 15, 1982.

On May 14, 1982, the Newmans filed a document with the Board nominally entitled "protest." In pertinent part, this letter stated: "The notice of proposed assessment resulted from a recent Franchise Tax Board Examination. The Franchise Tax Board auditor raised questions regarding the California apportionment of the Newmans' film income but did not discuss many of the proposed adjustments prior to the issuance of his report. . . . [¶] '*The Sting*' Our position on income derived from 'The Sting' is unchanged from prior years. The proper percentage of California income is 55.56%. This is based on California work days over total contract days. [¶] The 1976 and 1977 returns reported the proper amounts, however, the allowable portion of 'Sting' income was overreported on the 1975 California tax return. The return reflected 83.30% when only 55.56% should have been reported."

The sufficiency of a claim does not turn on the nomenclature used. Section 19055 requires only that a claim for refund be in writing and state the

grounds therefor. The Newmans' May 14 letter clearly satisfies these requirements and apprises the Board that the Newmans contended they had overreported their income in 1975. As the purpose of a claim for refund "is to put [the Board] on notice that a right is being asserted with respect to an overpayment of tax," we are in accord with the trial court's determination that the Newmans' written statement regarding their position on the overpayment, and the Board's knowledge of their proposed allocation, qualifies the May 14, 1982, document as a claim for refund. (*Newton* v. *United States* (Ct. Cl. 1958) 163 F.Supp. 614, 618.)

## DISPOSITION

The judgment is affirmed.

McClosky, Acting P. J., and George, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 1, 1989.