[No. B073188. Second Dist., Div. One. Dec. 13, 1993.]

MARC D. WILSON et al., Plaintiffs and Respondents, v.
FRANCHISE TAX BOARD, Defendant and Appellant.

**COUNSEL**

Daniel E. Lungren, Attorney General, Edmond B. Mamer and Jack T. Kerry, Deputy Attorneys General, for Defendant and Appellant.

Staker & Gose, Gose, Panitz & Lechman and Philip Garrett Panitz for Plaintiffs and Respondents.

**OPINION**

**ORTEGA, J.**—During 1984-1986, plaintiff Marc D. Wilson played quarterback for the Los Angeles Raiders. In the off-season during those years,

Wilson lived in Washington State and thus was not a California resident for California income tax purposes. However, because Wilson's income from his Raiders contract derived from a California source, he paid California income tax on a portion of his income for those years. Wilson's income tax was based on a ratio, set out in defendant California Franchise Tax Board's (the Board) administrative regulation (Audit Ruling AR-125.1) governing the percentage of a nonresident athlete's California source income subject to state tax, of the number of days he worked in California (the ratio's numerator) compared to the total number of days he actually worked or had to be available for work (its denominator). Wilson claimed his contract required him to be available for work every day each year, resulting in 41-45 percent of his income being taxable.

The Board assessed additional taxes for 1984-1986, arguing that under Wilson's Raiders contract, he only worked or had to be available for work during the football season. The Board's calculation subjected 88-91 percent of Wilson's income to state tax. Wilson paid the additional taxes under protest and filed this case, seeking a refund. The trial court agreed with and entered judgment for Wilson. The Board appeals.

We agree with the Board's interpretation of Wilson's contract and reverse the judgment.[1]

## FACTS

In 1980, the Raiders drafted Wilson, who played college football at Brigham Young University, and loaned him $125,000. Pursuant to a promissory note signed July 24, 1980, Wilson agreed to repay the loan plus interest on August 23, 1985. Wilson played quarterback for the Raiders until 1988. This case involves Wilson's 1984 through 1986 Raiders income.

On October 21, 1983, Wilson and the Raiders signed a series of three identical National Football League (NFL) one-year contracts, under which the Raiders paid Wilson, respectively, $700,000, $800,000, and $900,000 in 1984-1986, not counting performance bonuses. According to paragraph 1,

---

[1] Wilson's wife, Colleen, is a nominal party, but she neither earned any of the disputed income nor played any role in the relevant facts. Other than as relevant, we omit further reference to her. The facts are taken from Wilson's contract, the parties' stipulations, and oral and deposition testimony admitted at trial. The trial court overruled the Board's parol evidence objection to introduction or consideration of any evidence other than Wilson's contract and the stipulations. We need not address the Board's claim that the trial court erred in admitting the evidence because as discussed below, (1) the evidence supports the Board's, not Wilson's, position, and (2) despite the parties' arguments, resolution of the issue does not affect the standard of review.

titled "TERM," each contract covered "one football season, and . . . beg[a]n on the date of execution or February 1, . . . whichever [was] later, and end[ed] on [the following] February 1 . . . ."

Paragraph 2, titled "EMPLOYMENT AND SERVICES," stated that the Raiders employed Wilson "as a skilled football player. [Wilson] accepts such employment. He agrees to give his best efforts and loyalty to the [Raiders], and to conduct himself on and off the field with appropriate recognition of the fact that the success of professional football depends largely on public respect for and approval of those associated with the game. [Wilson] will report promptly for and participate fully in [the Raiders'] official pre-season training camp, all [Raiders] meetings and practice sessions, and all pre-season, regular-season and post-season football games scheduled for or by [the Raiders]. If invited, [Wilson] will practice for and play in any all-star football game sponsored by the [NFL]. [Wilson] will not participate in any football game not sponsored by the [NFL] unless the game is first approved by the [NFL]."

Paragraph 3, titled "OTHER ACTIVITIES," stated: "Without prior written consent of [the Raiders], [Wilson] will not play football or engage in activities related to football otherwise than for [the Raiders] or engage in any activity other than football which may involve a significant risk of personal injury. [Wilson] represents that he has special, exceptional and unique knowledge, skill, ability, and experience as a football player, the loss of which cannot be estimated with any certainty and cannot be fairly or adequately compensated by damages. [Wilson] therefore agrees that [the Raiders] will have the right . . . to enjoin [Wilson] . . . from playing football or engaging in football-related activities other than for [the Raiders] or from engaging in any activity other than football which may involve a significant risk of personal injury."

Paragraph 4, titled "PUBLICITY," stated: "[Wilson] grants to [the Raiders] and [NFL] . . . the authority to use his name and picture for publicity and promotional purposes . . . . [Wilson] will cooperate with the news media, and will participate upon request in reasonable promotional activities of [the Raiders] and the [NFL]."

Paragraph 5, titled "COMPENSATION," stated that, in addition to Wilson's yearly salary and any incentive bonuses, the Raiders would pay Wilson's "necessary traveling expenses from his residence to training camp; . . . reasonable board and lodging expenses during pre-season training and in connection with playing pre-season, regular-season, and post-season football games outside [Los Angeles]; . . . necessary traveling expenses to and from

pre-season, regular-season, and post-season football games outside [Los Angeles] . . . ."

In lieu of the standard payment schedule, set out in paragraph 6, under which Wilson's annual salary would have been paid weekly during the pre- and regular season, an addendum provided that Wilson's salary would be paid in 12 equal monthly installments. Wilson could not remember at which party's request this alternative payment schedule was inserted into his contracts. Tom Flores, Raiders head coach throughout the three-year period, testified that the method of payment generally is an option decided by the player.

Paragraph 8, titled "PHYSICAL CONDITION," stated: "[Wilson] represents to [the Raiders] that he is and will maintain himself in excellent physical condition. [Wilson] will undergo a complete physical examination by the [Raiders'] physician upon [the Raiders'] request, during which physical examination [Wilson] agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the [Raiders'] physician about such condition. If [Wilson] fails to establish or maintain his excellent physical condition to the satisfaction of the [Raiders'] physician, or make the required full and complete disclosure and good faith responses to the [Raiders'] physician, then [the Raiders] may terminate this contract."

Paragraph 9, titled "INJURY," stated: "If [Wilson] is injured in the performance of his services under this contract and promptly reports such injury to the [Raiders'] physician or trainer, then [Wilson] will receive such medical and hospital care during the term of this contract as the [Raiders'] physician may deem necessary, and, in accordance with [the Raiders'] practice, will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period, as [Wilson] is physically unable to perform the services required of him by this contract because of such injury. . . ." An addendum guaranteed Wilson's salary throughout the three-year period if Wilson was unable to play because terminated by the Raiders or due to injury or death.

Paragraph 11, titled "SKILL, PERFORMANCE AND CONDUCT," stated: "[Wilson] understands that he is competing with other players for a position on [the Raiders'] roster within the applicable player limits. If at any time, in the sole judgment of [the Raiders], [Wilson's] skill or performance has been unsatisfactory as compared with that of other players competing for positions on [the Raiders'] roster, or if [Wilson] has engaged in personal conduct

reasonably judged by [the Raiders] to adversely affect or reflect on [the Raiders], then [the Raiders] may terminate this contract."

Paragraph 14, titled "RULES," stated: "[Wilson] will comply with and be bound by all reasonable [Raiders] rules and regulations in effect during the term of this contract which are not inconsistent with the provisions of this contract . . . ."

Paragraph 22, titled "OTHER AGREEMENTS," stated: "This contract, including any attachment to it, sets forth the entire agreement between [Wilson] and [the Raiders] and cannot be modified or supplemented orally. [Wilson] and [the Raiders] represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between [Wilson] and [the Raiders] . . . ."

Paragraph 24.2, contained in an addendum and titled "FORGIVENESS OF DEBT," stated: "In consideration for execution of this Agreement, all debt incurred under note of July 24, 1980, between Wilson and [the Raiders] shall, subject to condition stated *infra*,[ ]be repaid on July 1, 1995 rather than July 23, 1985. Further, if from 1984 through 1987 Wilson retains a residence in the western states of California and/or Oregon and/or Washington during the off-season and thus is accessible to [the Raiders], for [Raiders] activities consistent with standard form contract, [the Raiders] agrees it will forgive all debt due under the note of July 24, 1980." During the three relevant years, the Wilsons lived in Washington State, where Wilson grew up, and where their four parents lived. The Raiders forgave Wilson's debt. Wilson lived in California only during the football season, and was not a California resident for state income tax purposes.

During the off-season in the three relevant years, other than an approximately one-month vacation, Wilson engaged in a six-day per week conditioning program involving running, weight training, and throwing designed by the Raiders' weight training and conditioning coach. His daily workout varied from two to three hours in the early off-season to five to six hours in the month before preseason training camp. Wilson periodically reviewed videotapes and discussed them, along with his workout program and injuries, with Raiders coaches. Wilson also attended annual May minicamps, and March quarterbacks and receivers camps, in California, and traveled to California for physical examinations, surgeries, and injury treatment. On all these occasions, the Raiders paid for Wilson's transportation to and from Washington, lodging, meals except on trips involving medical treatment or surgeries, and medical care.

Wilson believed his contract required him to be available at all times during the off-season for special sessions, training, medical care, media access, or anything else the Raiders desired of him. Raiders coaches stated that, while failure to attend off-season camps, train, treat injuries, or consult with coaches was not directly punished, and, in that sense, such activities were technically voluntary, the ultimate sanction was the team's unilateral ability to decide whether a player made the regular season team. Although acknowledging these off-season activities were not expressly mandated under Wilson's contract, the coaches considered them mandatory parts of players' team participation and obligations as professional athletes. When not participating in such activities during the off-season, Wilson was free to travel and otherwise come and go without notifying the Raiders or receiving their permission.[2]

The "Board shall prescribe all rules and regulations necessary for the enforcement of this part and may prescribe the extent to which any ruling or regulation shall be applied[.]" (Rev. & Tax. Code, § 19253.) "In the case of nonresident taxpayers the gross income includes only the gross income from sources within this State." (Rev. & Tax. Code, § 17951.) "[G]ross income from sources within and without this State shall be allocated and apportioned under rules and regulations prescribed by the . . . Board." (Rev. & Tax. Code, § 17954.) Pursuant to its rulemaking authority, the Board enacted California Code of Regulations, title 18, section 17951-5, subdivision (b), which states: "If nonresident employees are employed in this State at intervals throughout the year, . . . and are paid on a daily, weekly or monthly basis, the gross income from sources within this State includes that portion of the total compensation for personal services which the total number of working days employed within the State bears to the total number of working days both within and without the State. . . ."

Regarding nonresident professional athletes, the Board enacted Audit Ruling AR-125.1 (hereinafter AR 125.1), which states: "Allocation of a player's . . . compensation will be made on the basis of the team's activity as follows: [¶] 1. Establish a ratio between the 'duty days' spent in California and total 'duty days'. Duty days include all days from the beginning of

---

[2]Wilson presented oral testimony of himself, Flores (through his deposition and diary), and Raiders assistant coach Terry Robiskie. The Board objected to admission or consideration of any evidence other than Wilson's written contracts and the parties' stipulations, described below, regarding the number of days in the three disputed years Wilson participated in various football related activities, on parol evidence grounds, arguing that Wilson's contracts were unambiguous and integrated. The Board also argued that even if parol evidence was admissible, the offered evidence was not proper parol evidence because the coaches were not involved in the contracts' negotiations, and Wilson, although a party, let his agent negotiate his contracts. The trial court overruled these objections, received the evidence, and, in its final ruling, found it credible.

official pre-season training through the last game in which the team competes, including post-season games occurring in the taxable year. [¶] . . . [¶] 2. Apply the ratio in (1) above to total season's compensation . . . . [¶] Exhibition games played either within or without the state and time spent in training camps enter into the computation. [¶] . . . [¶] It is emphasized that AR 125.1 is to be used as a guideline for apportioning salary. If a player's contract does not conform to the ruling, other apportionment methods may be required. However, in any computation, AR 125.1 should be used as a starting point for apportioning salary, with the burden of proof upon the taxpayer to show where the method is unreasonable as applied to him."

Wilson and the Board agreed that "regular season includes [four categories: 1)] California duty dates, [2)] one special session, which includes quarterback camps, [throwing camps,] practices off-season, meetings with coaches, [all in California,] and then [3)] medical related to football injuries and [4)] minicamps. . . ." The parties agreed that in 1984, Wilson had 144 California duty days, 1 special session day, 4 medical injury days, and 4 mini-camp days, totaling 153 days. Wilson argued the numerator should be 153 days, because they were either football season days or required off-season work days in California, and the denominator should be 366 days, because under his contract he either worked or had to be available for work every day of the year. If so, 41.8 percent of Wilson's 1984 Raiders income would be subject to California income tax. The Board argued the numerator should be 144 days, because the other 9 California duty days occurred during the off-season and were not regular season duty days as defined in AR 125.1. The Board argued the denominator should be 162 days, which included additional non-California football season days when Wilson was playing road games in other states. The Board's calculation subjected 88.88 percent of Wilson's 1984 income to state income tax.

For 1985, the parties agreed Wilson had 138 California duty days, 19 special session days, 5 medical days, and 3 minicamp days, totaling 165 days. Wilson argued the numerator should be 165, the denominator should be 365, resulting in 45.21 percent of his income being subject to state income tax. The Board argued the numerator should be 138, the denominator should be 152, subjecting 90.79 percent of Wilson's income to tax.

For 1986, the parties agreed Wilson had 142 California duty days, 16 special session days, 4 medical injury days, and 3 minicamp days, totaling 165 days. Wilson argued the numerator should be 165, the denominator should be 365, resulting in 45.21 percent of his income being subject to state income tax. The Board argued the numerator should be 142, the denominator should be 156, subjecting 91.03 percent of Wilson's income to state tax.

For all three years, the difference in the amount of taxes owed under Wilson's and the Board's calculations was $119,792.64, including penalties and interest. The Board assessed and Wilson paid this additional amount. Wilson sought a refund. When the Board denied Wilson's refund request, he brought this suit for a refund.

In its thorough and thoughtful 10-page statement of decision, the trial court accepted Wilson's argument and annual income ratio calculations and gave him judgment. The trial court stated it found the oral evidence credible and concluded, based on a reading of the contract and the other evidence, that Wilson was contractually obligated to train and be available for football activities year round. While acknowledging the closeness of the issue and the parties' positions, the trial court accepted Wilson's argument that, given the competitive nature of modern professional football, year-round training and practice is required for success, and that the Board's reliance on AR 125.1's exclusion of any off-season days, whether in or out of California, from its duty day formula was arbitrary as applied to Wilson. The Board appeals.

## ISSUE

The Board contends the trial court erred in admitting or considering parol evidence regarding the meaning of Wilson's contracts, and finding the Board's calculation of Wilson's income subject to state income tax arbitrary.

## DISCUSSION

Preliminarily, Wilson "does not dispute the . . . Board's authority to enforce the personal income tax laws of . . . California, and [its] authority to . . . promulgat[e] regulations and rules to assist such enforcement. Nor does [Wilson] dispute the general applicability or need for an allocation formula to be used to apportion between California Source Income ('CSI') and Non-California Source Income ('Non CSI') for non-residents that earn income in . . . California. [¶] [Wilson] does not dispute that the formula put forth in California Code of Regulations, title 18 [section] 17951-5, subdivision (b), where working days in California are divided by the total of working days both in and outside of California, generally is a fair and reasonable method of apportioning income between jurisdictions." Wilson's claim below and on appeal is that the Board's exclusion of off-season football activity from duty days under AR 125.1, regardless of its location, is arbitrary.

■ Undisputed legal principles govern our analysis. "The Board correctly urges the following propositions: the burden is on the taxpayer

claiming an exemption to show entitlement to the exemption. [Citation.] Doubt as to the applicability of the exemption is to be resolved against the exemption. [Citations.] Administrative interpretation of a statute by the agency charged with its enforcement is entitled to great weight unless shown to be clearly erroneous or unauthorized. [Citations.]" (*American Hospital Supply Corp.* v. *State Bd. of Equalization* (1985) 169 Cal.App.3d 1088, 1091-1092 [215 Cal.Rptr. 744].) "In an action for a refund of taxes, the taxpayer has the burden of establishing all the facts necessary to establish its right to a refund. [Citations.]" (*Jimmy Swaggart Ministries* v. *State Bd. of Equalization* (1988) 204 Cal.App.3d 1269, 1276 [250 Cal.Rptr. 891].)

■  The parties dispute the applicable standard of review which must govern our analysis. The Board argues that, because Wilson's contracts were integrated and unambiguous, the trial court should not have admitted parol evidence to explain or supplement them. The Board concludes our analysis should be limited to Wilson's written contracts, analysis of which is a legal issue which we independently review, ignoring the trial court's ruling. Wilson argues that, because the evidence is undisputed, the Board having introduced no contrary evidence, our review should be governed by the substantial evidence test.

Both parties are partially correct. Wilson correctly notes that the evidence is undisputed, in that there was no conflict in the testimony, i.e., the Board did not introduce evidence contradicting the coaches' testimony that, while participation in off-season football activities technically was voluntary, in that failure was not directly punished, it was considered a mandatory part of team participation and an obligation as a professional athlete, and could be punished by the ultimate sanction of being cut from the team. The dispute is not in the evidence, but in how to interpret the contracts, and whether the Board's interpretation is arbitrary. Those are legal issues. In tax cases, when confronted with undisputed facts, the appellate court independently reviews the entire record. "This case was presented to the trial court upon stipulations of fact and oral and documentary evidence which supplemented the stipulations. As there was no conflict in the evidence the decisive facts are undisputed and we are confronted with questions of law and not bound by findings of the trial court. [Citations.]" (*Mole-Richardson Co.* v. *Franchise Tax Bd.* (1990) 220 Cal.App.3d 889, 894 [269 Cal.Rptr. 662].) "When presented with uncontradicted facts on appeal in tax matters, the appellate court is free to make its own determinations. [Citation.] Our review of the legal question at issue is undertaken independently and we are not bound by the trial court's determination." (*Rain Bird Sprinkler Mfg. Corp.* v. *Franchise Tax Bd.* (1991) 229 Cal.App.3d 784, 794 [280 Cal.Rptr. 362].) Thus, we need not resolve the dispute over the admissibility of parol evidence interpreting the contracts to determine the applicable standard of review.

Independently reviewing the entire record, we first analyze Wilson's contracts. Although, like the trial court, we think the issue a close one, reading the contract as a whole, we conclude that Wilson's contracts did not require year round availability or participation in off-season football activity. Wilson points to the one-year term of each contract (paragraph 2), the language in paragraph 2 stating that he "will report promptly for and participate fully in . . . official pre-season training camp, all . . . meetings and practice sessions, and all pre-season, regular-season and post-season football games . . . ," the publicity requirements of paragraph 4 (Wilson "will cooperate with the news media, and will participate upon request in reasonable promotional activities . . ."), the requirement that he maintain himself in excellent physical condition and report injuries and submit to physical examinations (paragraph 8), his entitlement to Raiders paid medical care for promptly reported injuries incurred while performing under the contract (paragraph 9), the requirement that he conform to Raiders rules (paragraph 14), his salary schedule of payments over the entire year rather than just the football season, and the debt forgiveness requirement exchanging the debt for off-season residence in Washington and availability for activities, in support of his position.

However, as pointed out by the Board, the contract does not require any participation in off-season activity. The term provision also states each contract covers one football season, which would not include the off-season. The listing of attendance at team practices and meetings in paragraph 2 follows the reference to preseason training camp, and the description of mandatory participation ends with postseason play. Most importantly, the only specific reference to mandatory off-season football activities comes in the forgiveness of debt section, a severable clause clearly demanded in exchange for separate consideration.

Moreover, we think the parol evidence supports the Board, not Wilson. Although Wilson and his coaches all said they thought off-season football activity was mandatory, the coaches conceded it was not because of the contract, but because of Wilson's obligations as a professional athlete and his self-interest in avoiding being cut. The fact that no sanctions applied to players who did not participate reinforces this conclusion. Although the Raiders paid Wilson's off-season medical expenses, we also think that was in their self-interest, since Wilson, unlike most players, had a guaranteed contract under which he would be paid even if cut from the team or unable to play due to injury. The requirements to maintain physical condition and to report injuries, while in Wilson's self-interest in that without them he would jeopardize his ability to make the team, are not specifically required under the contract.

The relevant case law supports the Board. In *Newman* v. *Franchise Tax Bd.* (1989) 208 Cal.App.3d 972 [256 Cal.Rptr. 503], actor Paul Newman, a nonresident, was under exclusive contract for an 11-week period during which the movie "The Sting" was filmed. In computing his income attributable to California sources, Newman included days in which he did not actually work but was "on-call" pursuant to a specific provision of his contract which required that he be available throughout the 11-week period. The Board rejected that computation, and argued that Newman was only working on days of actual work. Division Four of our district affirmed the trial court's judgment for Newman under AR 125.1. The court explained that Newman, unlike Wilson, was specifically required to be "on-call" throughout the 11-week filming period.

Likewise, *Stemkowski* v. *C. I. R.* (2d Cir. 1982) 690 F.2d 40 supports the Board. Stemkowski, a Canadian citizen who received income as a professional hockey player for the New York Rangers, argued that provisions of his contract requiring that he report to training camp in good physical condition meant that his contract covered the off-season as well as the hockey season. The appellate court affirmed that portion of the trial court's ruling disallowing Stemkowski's argument: "Fitness is not a service performed in fulfillment of the contract but a condition of employment. There was no evidence that Stemkowski was required to follow any mandatory conditioning program or was under any club supervision during the off-season. He was required to observe, if anything, only general obligations, applicable as well throughout the year, to conduct himself with loyalty to the club and the league and to participate only in approved promotional activities." (*Id.* at p. 46.) Likewise, Wilson's contract did not mandate his off-season conditioning program, and the coaches agreed a player would not be directly penalized for failing to participate in one. The sanction was that such a player put himself at a comparable disadvantage with other players in making the regular season team.

Finally, we think this result a fair one. Nearly all Wilson's football income was earned in California. Wilson claims adopting the Board's position could expose him to double taxation in states which tax nonresident athletes' income based on road games in their states. However, Wilson cites no actual cases or statutes indicating that such systems exist or that he is threatened with such taxes, and, at oral argument, the Board, without contradiction, asserted Wilson would receive a credit for any such taxes against his California assessment. Wilson's ratio would permit him to pay income tax on less than half the income clearly earned within the state. While his self-interest encouraged him to train year round, his contract did not require it. We expressly limit our analysis and conclusion to the contracts before us.

Despite our colloquy with counsel at oral argument, we express no opinion regarding whether, if Wilson's contracts expressly provided that he be available all year, the Board could introduce evidence that he actually was not. Thus, we agree with the Board's ratio.

## DISPOSITION

We reverse the judgment, and remand the matter to the trial court with instructions that it enter judgment for the Board. The parties are to bear their own costs.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.

Respondents' petition for review by the Supreme Court was denied March 3, 1994.