[No. B164141. Second Dist., Div. Eight. Dec. 23, 2003.]

AUTOMOTIVE FUNDING GROUP, INC. et al., Plaintiffs and
Respondents, v.
JOHN GARAMENDI, as Insurance Commissioner, etc., et al., Defendant
and Appellant.

**COUNSEL**

Bill Lockyer, Attorney General, W. Dean Freeman, Mark P. Richelson and Brian D. Wesley, Deputy Attorneys General, for Defendant and Appellant.

Barger & Wolen, Robert W. Hogeboom and Robert J. Cerny for Plaintiffs and Respondents.

**OPINION**

**RUBIN, J.**—State Insurance Commissioner John Garamendi appeals from the judgment in an administrative mandate action which determined that a debt cancellation program offered by car finance lender Automotive Funding Group, Inc., was not insurance and therefore was not subject to regulation by the Department of Insurance.[1] For the reasons set forth below, we affirm the judgment.

### FACTS AND PROCEDURAL HISTORY

The State Insurance Commissioner contends that a debt cancellation program offered by used car lender Automotive Funding Group, Inc. (AFG),[2] was in fact insurance, subject to regulation by the Department of Insurance (the Department). Rejecting a contrary decision by an administrative law judge, the Department issued a decision and order to show cause requiring AFG to stop offering its Loss Damage Waiver program (LDW) until it obtained an insurance sales license. AFG brought an administrative mandate action in the superior court, which found that the LDW was not insurance and entered judgment for AFG.

The mandate action was tried primarily on certain stipulated facts, along with the sales and LDW contracts entered into by the car buyers. The evidence showed that AFG buys installment sales contracts from used car dealers and makes loans to the car buyers. AFG obtains a lien on the car as security for the loan. As a condition of the loan, the buyer must protect AFG's lien either by obtaining insurance for physical damage to or theft of the car or by participating in the LDW. The LDW states that it does not

---

[1] When this action was first brought, Harry Low was the insurance commissioner.

[2] AFG was doing business as County Financial Services, but we will refer to it as AFG.

provide liability coverage, and the Department does not contend that the LDW applies to third party claims against a car buyer for accidents caused by the buyer.

Under the LDW, the buyer must report to AFG whenever the car sustains damage of more than $500. Using licensed insurance adjusters, AFG determines whether the car is repairable or a total loss. If the car is declared a loss, then the debt is cancelled and AFG may take possession of the car. The LDW states that if the car is repairable, "the cost of any such repairs shall be at [AFG's] approval and expense." The parties stipulated that if the car is not a total loss, then AFG "may choose to repair it," paying for any repairs, minus the first $500 and certain other costs. AFG has "complete control and direction of whether a given vehicle is repaired or a total loss . . . ." Repair costs are paid to the body shop, not to the buyer. The LDW states prominently in several places that it is not a contract of insurance and that its sole purpose is to shift to AFG the risk of loss to its lien. It also states that it "is not intended to provide Buyer with any benefit whatsoever beyond the shifting of risk of loss of the vehicle . . . up to an amount equaling [AFG's] lien interest . . . ." The LDW applies in only limited circumstances, excluding from its reach damage due to intentional or reckless conduct, off-road use, drunken driving, towing, snow chain use, mechanical breakdowns, speed contests, and others.

The buyer's costs for the LDW are determined by the amount borrowed and the term of the loan. Although the costs can range from $100 to $6,480, the average fee charged by AFG is about $1,300 for a two-year loan. The fee is included in the monthly finance charge and, on average, is $55 a month. A nonrefundable fee of $100 is charged, and the LDW must be maintained for at least 30 days. If the buyer obtains insurance, he may cancel the LDW. Sixty-one percent of AFG's sales contracts have terms of three years or less, while 91 percent of the autos purchased with an AFG loan are worth less than $10,000. Because of the low value of the cars financed by AFG, 80 percent of reported thefts or collisions under the LDW result in the declaration of a total loss. Most of AFG's borrowers are considered high risk and buy low-priced cars. In many cases, AFG is the only willing lender. AFG has arrangements with about 50 used car dealers throughout the state to buy and assume their installment sales contracts and financed about 4,700 such purchases in the year 2000. As of July 2001, approximately 2,300 LDW's were in force. AFG is licensed by the state's Department of Corporations and is also regulated under the California Finance Lenders Law. (Fin. Code, § 22000 et seq.) It has been in business for 40 years, is financially stable, and has never been the subject of a complaint to the Departments of Insurance or Corporations.

## STANDARD OF REVIEW

█ In administrative mandate actions, the trial court's inquiry is limited to whether the Department acted without or in excess of jurisdiction, whether there was a fair trial, or whether there was a prejudicial abuse of discretion. An abuse of discretion is established if the Department did not act in the manner required by law, if its decision is not supported by the findings, or if the findings are not supported by the evidence. (Code Civ. Proc., § 1094.5, subd. (b).) Because the primary issue involves a legal question— interpretation of a statute—however, we apply de novo review. (*Fireman's Fund Ins. Companies v. Quackenbush* (1997) 52 Cal.App.4th 599, 604 [60 Cal.Rptr.2d 732].) As for the Department's interpretation of the insurance statutes, we give it some deference, but ultimately decide the issue on our own. (*State Farm Mutual Automobile Ins. Co. v. Quackenbush* (1999) 77 Cal.App.4th 65, 71 [91 Cal.Rptr.2d 381].) █ To the extent we interpret the present sales contract and the LDW, based on a set of stipulated facts, these too are questions of law (*Wilson v. Franchise Tax Board* (1993) 20 Cal.App.4th 1441, 1450 [25 Cal.Rptr.2d 282]) that we resolve by de novo review. (*McIntosh v. Aubry* (1993) 14 Cal.App.4th 1576, 1584 [18 Cal.Rptr.2d 680].)

## DISCUSSION

It is against the law to sell insurance without a license from the Department. (Ins. Code, § 700, subds. (a), (b).) Insurance Code section 22 (section 22) defines insurance as "a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." Section 22 has been interpreted as requiring two elements: (1) shifting one party's risk of loss to another party; and (2) distribution of that risk among similarly situated persons. (*Truta v. Avis Rent A Car System, Inc.* (1987) 193 Cal.App.3d 802, 812 [238 Cal.Rptr. 806] (*Truta*).) The Department contends that the LDW meets these criteria. Its starting point, and ours, is *Truta*, where the court held that a car rental company's collision damage waiver was not insurance.

█ The plaintiff in *Truta* brought a class action against several car rental companies, contending they were engaged in unfair business practices by offering customers a collision damage waiver that was, in effect, an unregulated insurance policy. The *Truta* court said that insurance regulations are not intended to apply to all businesses having some element of risk assumption or distribution in their operations. Whether or not a risk-shifting arrangement is insurance instead turns on two factors: (1) to what extent the specific transactions or the general line of business at issue involve one or more of the evils at which the regulatory insurance statutes were aimed; and

(2) whether the elements of risk shifting and risk assumption were a central and important part of the transaction or were merely incidental to other elements that gave the transaction its distinctive character. (*Truta, supra,* 193 Cal.App.3d at pp. 812–813.)

The collision damage waiver at issue in *Truta* gave car renters the option of paying $6 a day to be relieved of liability for damage or loss to their rental car of up to $1,000. The appellate court held that this was not insurance because "[t]he principal object and purpose of the transaction before us, the element which gives the transaction its distinctive character, is the rental of an automobile. Peripheral to that primary object is an option, available to the lessee for additional consideration, to reallocate the risk of loss (up to the sum of $1,000) to the lessor in the event the vehicle sustains damage during the rental term. Thus, . . . after reviewing the entire contract we are satisfied that this tangential risk allocation provision should not have the effect of converting the defendants as contracting lessors into insurers subject to statutory regulation. . . ." (*Truta, supra,* 193 Cal.App.3d at p. 814.)

The *Truta* court relied in part on *Transportation Guar. Co. v. Jellins* (1946) 29 Cal.2d 242 [174 P.2d 625] (*Jellins*), where the plaintiff sued for breach of its contract to maintain and repair two of defendant's trucks. (*Truta, supra,* 193 Cal.App.3d at pp. 813–814.) The defendant in *Jellins* contended the contract was illegal because it amounted to insurance, pointing to clauses that obligated plaintiff to maintain insurance on the trucks and to repair any collision damage they sustained. The Supreme Court disagreed.

In reaching that conclusion, the *Jellins* court said that the presence of risk shifting or risk assumption does not outweigh all other factors when determining whether a contract is subject to the insurance laws. " 'If attention is focused only on that feature, the line between insurance or indemnity and other types of legal arrangement and economic function becomes faint, if not extinct. . . . But obviously it was not the purpose of the insurance statutes to regulate all arrangements for assumption or distribution of risk. That view would cause them to engulf practically all contracts, *particularly conditional sales* and contingent service agreements. The fallacy is in looking only at the risk element, to the exclusion of all others present or their subordination to it. The question turns, not on whether risk is involved or assumed, but on whether that or something else to which it is related in the particular plan is its principal object and purpose.' " (*Jellins, supra,* 29 Cal.2d at p. 249, quoting *California Physicians' Service v. Garrison* (1946) 28 Cal.2d 790, 809 [172 P.2d 4] (*Garrison*), italics added.)

In making that determination, "each contract must be tested by its own terms, as they are written, as they are understood by the parties, and as they

are applied under the particular circumstances involved." (*Jellins, supra,* 29 Cal.2d at p. 248.) Pointing to contract terms specifying the various repair and maintenance tasks plaintiff undertook, the *Jellins* court applied the ordinary rules of contract interpretation and concluded that the primary objective of the contract was service, not insurance. (*Id.* at pp. 247–252.)[3]

*Truta* also relied on *Garrison,* where the Supreme Court held that a nonprofit medical corporation that collected monthly dues to pay for the provision of medical services was not in the business of insurance. Citing to *Garrison,* the *Truta* court said that insurance regulations, particularly those relating to the maintenance of reserves and the regulation of investments and financial operations, are designed to protect the insured or the public from the insurer. Those regulations become important only if the putative insurer has assumed definite obligations. They are not intended to apply where no risk is assumed and no default can exist. (*Truta, supra,* 193 Cal.App.3d at p. 813, citing *Garrison, supra,* 28 Cal.2d at p. 810.) The *Truta* court also observed that the insurance laws do not create an absolute prohibition against risk shifting and risk assumption provisions in contracts for the sale of services or goods. The presence of something akin to insurance closely associated with the predominant element of the transaction—the element that gives the transaction its distinctive character—does not conclusively demonstrate that the transaction is subject to the state's insurance laws. (*Truta, supra,* at p. 812.)

The Department contends that several facts distinguish this case from *Truta* and compel us to hold that the LDW was insurance: (1) the LDW was mandatory, especially given the inability of most AFG borrowers to obtain financing elsewhere; (2) the LDW comprised a separate transaction and was contained in a separate document; (3) while the $6 daily damage waiver in *Truta* was just .6 percent of the $1,000 coverage offered, the high cost of the LDW can amount to as much as 25 percent of the financed cost on a $26,000 loan, making the LDW an intrinsic part of the loan; (4) because AFG will cancel the debt or repair the damage to a covered automobile, the LDW offers far more protection than the *Truta* $1,000 damage waiver, making it far more like traditional insurance; (5) the LDW includes a $500 "deductible" similar to that found in auto insurance policies; (6) AFG uses insurance adjusters to determine whether a car is repairable or a total loss; (7) AFG does not accumulate reserves, thereby increasing the risk it may not fulfill its obligations under the LDW; and (8) consumers need protection should AFG declare a car a total loss near the end of the loan term, canceling the small remaining

---

[3] Because it was considering a judgment roll appeal, the *Jellins* court did so in part by presuming that there was parol evidence favorable to the defendant. (*Jellins, supra,* 29 Cal.2d at pp. 245–246, 254–255.) This does not alter the fact that the ordinary rules of contract interpretation were applied.

debt while taking the car from the buyer. Although we acknowledge that the Department understandably is concerned about consumer protection, we disagree with the Department's principal factual and legal assertions.

■ The Department contends that participation in the LDW is mandatory because AFG requires insurance as a condition of financing the loan and because the buyer does not learn about the LDW until after he has purchased his car and the contract has been sold to AFG. Although the stipulated facts state generally that most of AFG's purchases occur soon after a car is bought, they state more specifically that the LDW fee is calculated by the *dealer* using a chart supplied by AFG, with the *dealer* adding the LDW fee to determine the purchase price and the amount to be financed. This is strong evidence that the LDW is offered and accepted as part of the original transaction.[4] Regardless, there is no evidence that the LDW was mandatory. The installment sales contract states that the buyer must have insurance covering the lender. Even though AFG's customers might be high-risk borrowers who are unable to obtain a loan elsewhere, that is hardly an unusual requirement and it is difficult to imagine any car loan financer who would not insist on protecting its security interest in that manner.[5] The LDW gives the buyer another means of satisfying that requirement. Offering an alternative to insurance does not mean that the alternative *is* insurance.[6] The Department's reliance on *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62 [104 Cal.Rptr.2d 602, 18 P.3d 29], to support its contention is misplaced. At issue in that case was mandatory participation in a particular disability insurance policy offered by the state's Department of Veterans Affairs as part of the CalVet home purchase program. Even though the required policy bore most of the hallmarks of traditional insurance, the court held it was not subject to regulation by the Department because the sole authority for administration of the CalVet program was vested in the

---

[4] The Department itself apparently believes this is so, concluding as much in its own decision overturning the findings of the administrative law judge.

[5] Several provisions of the Automobile Sales Finance Act (Civ. Code, § 2981, et seq.) recognize and provide for a lender's right to require, and finance the cost of, physical damage insurance. (See Civ. Code, §§ 2982, subd. (a)(3), 2982.8, 2983.3, subd. (d)(3), 2984.1.) AFG has asked us to judicially notice amendments to certain provisions of the Automobile Sales Finance Act which make mention of car loan debt cancellation provisions. As amended, Civil Code section 2982, subdivision (a)(1)(H) will require lenders to separately itemize charges for debt cancellation contracts while subdivision (i)(1) requires separate itemization of insurance charges. Based on these distinct provisions, AFG reasons that debt cancellation is recognized by the Legislature as something entirely apart from insurance. (Assem. Bill No. 964, 2003–2004 Reg. Sess.) We decline to judicially notice this amendment for two reasons: (1) it has not yet taken effect; and (2) it begs the question whether any provision styled as debt cancellation might, by its terms and effect, be considered insurance.

[6] There is no evidence as to what percentage of AFG's borrowers choose the LDW over insurance. Although the parties speculate as to why a buyer would select the LDW in lieu of insurance, there is no evidence in the record on that point either.

Department of Veterans Affairs. (*Id.* at pp. 72–74.) Nothing in the facts of that case indicates that another form of coverage would have sufficed.

The Department's cost-value comparison between the collision damage waiver in *Truta* and the LDW is apples-to-giraffes mathematics. For $6 a day, the car rental company agreed to assume just $1,000 worth of risk to its rental cars. The stipulated facts showed that most of AFG's loans were less than $10,000 and for terms of less than three years. Using AFG's LDW cost chart, a $10,000 loan for a three-year period would cost $2,006. Under that scenario, the buyer would pay slightly more than $1.83 a day—much less than the $6 car rental damage waiver—to shift a $10,000 risk of loss to AFG. Nor is there evidence that the cost of the LDW is different from or comparable to the cost of insurance or that it is disproportionate to the risk that AFG assumes under the LDW.

■ The Department's use of the term "deductible" to characterize the $500 floor at which the LDW kicks in is nothing more than that—a characterization. Neither the LDW nor the parties' stipulated facts refer to it as such, there is no other evidence on that point, and it is just as easily viewed as the level of damage at which AFG believes a substantial risk of loss to its security interest begins. Nor are we persuaded by AFG's use of insurance adjusters to determine whether a car is a total loss or by its use of a separate document to carry out the LDW transaction. Instead, as the cases cited above make clear, the true focus is on the nature and terms of the LDW, and whether the risk shifting accomplished by the LDW is the principal object and purpose of AFG's transactions.

■ We do not believe that the LDW represents the principal object of AFG's transaction. As noted above, the LDW is not mandatory. Nor is there evidence that its cost is inflated, that it provides some profit to AFG, or confers any benefit on AFG apart from covering the risks it assumes under the LDW. Protecting AFG's security interest in the cars it finances is a secondary objective which AFG allows through either third party insurance or the LDW. (See *Title Ins. Co. v. State Bd. of Equalization* (1992) 4 Cal.4th 715, 725–727 [14 Cal.Rptr.2d 822, 842 P.2d 121] [title insurance company's underwriting agreement with companies that prepared title reports (title companies) obligated title companies to pay some portion of certain title insurance claims; the agreement was not insurance because, among other things, the principal objective was to give the title company incentive to conduct diligent title searches].) Therefore, as the trial court correctly observed, the primary objective of AFG's transactions is to finance a used car purchase.

Neither the terms nor the conditions of the LDW suggest an insurance policy. Although not dispositive, the LDW prominently states in many places

that it is not insurance. The contract terms, as clarified by the stipulated facts, make clear that this is so. The preamble to the agreement notes the insurance requirement, but states that AFG is willing to waive that requirement and shift the risk of loss to itself pursuant to the LDW's terms. It states that because the LDW is not an insurance policy, AFG has the sole discretion to determine whether a damaged car is repairable or a total loss. It also states that it provides no benefit to the buyer except for shifting the risk of loss. If the car is totaled, AFG simply cancels the debt. If not, then AFG has the option of repairing the car at its expense. Nowhere does AFG promise to make repairs: it merely states that if a car is repairable, than "any such repairs shall be at [AFG's] approval and expense." According to the stipulated facts, AFG "may choose" to make repairs and has total control and discretion over whether a vehicle is repaired or a total loss.[7] In short, AFG promises to do nothing except bear the risk of loss due to theft or physical damage, with the right to make repairs at its expense if it chooses. (Compare *Grand Rent A Car Corp. v. 20th Century Ins. Co.* (1994) 25 Cal.App.4th 1242, 1252 [31 Cal.Rptr.2d 88] [priority of coverage dispute between self-insured auto lessor and car renters' auto insurers: car lease provisions were insurance because the lease stated that the rental agency would indemnify the renter for liability to others, the provision was described as "coverage," and was in a section titled "Liability Insurance"; court contrasted that provision with a collision damage waiver which expressly stated it was not insurance].) As a result, the Department's contention that insurance regulations should apply to the LDW in order to ensure that AFG has sufficient reserves to meet its obligations is not well taken.

■ To recap, the sales contract requires the buyer to give AFG a lien on the car and protect its security interest by providing insurance which protects that interest. The preamble to the LDW states that AFG will waive that requirement if the buyer chooses the LDW instead of insurance. Instead of requiring the buyer to protect AFG's risk of loss by shifting that risk to the

---

[7] AFG conceded at oral argument that the LDW would be insurance if the LDW contractually obligated AFG to make repairs in all instances where a car had been damaged but not totaled. Without deciding that issue, we believe the LDW is somewhat ambiguous as to the extent of AFG's obligation to repair: It does not expressly provide that AFG has the option of deciding whether to repair a car that has not been totaled, stating instead that if a car is repairable, "the cost of any such repairs shall be at [AFG's] approval and expense." It is arguable that this ambiguity could be construed as a promise to make repairs whenever a car has not been totaled. However, any ambiguity was removed at least in the present case by the stipulated facts, which stated that "[t]he LDW also provides that if the automobile is damaged but not a total loss, AFG may choose to repair it." Based on this, we hold that the LDW gives AFG the option whether to repair a car that has not been totaled. Because of the potential ambiguity, we also make clear that our holding applies only as to this action between AFG and the Department. It has no bearing on any actions that might be brought against AFG by borrowers taking part in the LDW program and does not foreclose a borrower from seeking to prove a different meaning under the ordinary rules of contract interpretation.

buyer's auto insurer, AFG agrees to retain its own risk of loss for a fee pursuant to the LDW. Under section 22, this arrangement cannot be insurance for the simple reason that AFG has not agreed to shift one party's risk—presumably the buyer's—to itself or anyone else. (*Truta, supra,* 193 Cal.App.3d at p. 812 [one fundamental hallmark of insurance under section 22 is shifting one party's risk of loss to another].)[8]

Finally, although we are ruling against the Department, we share its concern that an unscrupulous lender could take advantage of a program like the LDW by declaring a car a total loss near the end of a loan's term, taking it away from the buyer while canceling the small, remaining debt. However, the mere possibility of such harm does not somehow transmute the LDW into an insurance policy. Nor is there any indication that AFG has ever engaged in such conduct. All the record shows is that AFG has been in business for 40 years, is financially sound, and has never been the subject of complaints to the Department of Insurance or the Department of Corporations. Furthermore, AFG is licensed and regulated under the California Finance Lenders Law. (Fin. Code, § 22000 et seq.) As such, it is subject to various consumer protection provisions. (Fin. Code, §§ 22112 [must post $25,000 surety bond]; 22157, 22158 [must maintain and preserve certain records], 22159 [must file annual reports open to public inspection], 22161 [may not make false or misleading representations or advertisements], 22163, 22164 [must fully and clearly state rates and charges], 22300 [no direct or indirect charges of any nature unless a loan is made], 22302 [subject to Civ. Code § 1670.5 prohibition against unconscionable contracts], 22303 [maximum rate schedule], 22328 [procedural rules for repossessed cars], 22331 [prohibition against taking confession of judgment], 22333 [prohibition against taking written instruments with blank spaces to be filled in after execution].)[9] Whether more consumer protections are needed, or whether the activities of lenders such as AFG should also be regulated by the Department, are matters for the Legislature, not for us.

---

[8] The parties have also relied on certain decisions interpreting the insurance laws of other states. We find them inapplicable to California's section 22 and therefore disregard them.

[9] Other consumer protections laws such as the Automobile Sales Finance Act (Civ. Code, § 2981 et seq.) may also apply, along with common law protections such as the implied covenant of good faith and fair dealing.

## DISPOSITION

For the reasons set forth above, the judgment is affirmed. Respondent AFG to recover its appellate costs.

Cooper, P. J., and Boland, J., concurred.