Filed 5/27/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE 2009 METROPOULOS FAMILY TRUST et al.,<br><br>     Plaintiffs and Appellants,<br><br>     v.<br><br>CALIFORNIA FRANCHISE TAX BOARD,<br><br>     Defendant and Respondent. | D078790<br><br><br>(Super. Ct. No.<br> 37-2020-00011877-CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Gregory W. Pollack, Judge.  Affirmed.

Dakessian Law, Mardiros Hagop Dakessian and Donald Eugene Chomiak for Plaintiffs and Appellants.

Pillsbury Winthrop Shaw Pittman and Carley Ann Roberts for California Taxpayers Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Rob Bonta, Attorney General, Tamar Pachter, Assistant Attorney General, Lisa W. Chao and Kara D. Siegel, Deputy Attorneys General, for Defendant and Respondent.

Plaintiffs and appellants The 2009 Metropoulos Family Trust, The Evan D. Metropoulos 2009 Trust (the Family Trust and Evan Trust respectively or at times collectively the trusts), and the trusts' trustee, the J.P. Morgan Trust Company of Delaware (the trustee), appeal from a summary judgment entered in favor of the California Franchise Tax Board (FTB) on plaintiffs' complaint seeking a refund of 2014 income taxes. The parties filed cross-motions for summary judgment, with plaintiffs arguing their pro-rata share of income received from an S corporation's November 2014 sale of a wholly-owned subsidiary was not subject to California income tax. The plaintiff trusts, who were shareholders in the S corporation Pabst Corporate Holdings, Inc. (Pabst), argued the income was derived from the sale of intangible property, namely goodwill associated with the subsidiary's business, whose taxation was governed by Revenue & Taxation Code section 17952 and its corresponding regulation (Cal. Code Regs., tit. 18, § 17952).[1] The trial court denied plaintiffs' motion and granted the FTB's, ruling (1) because the S corporation had characterized the income as business income on its return, the trusts were bound to treat their respective shares of that income the same way on their federal and California tax returns; and (2) even if section 17952 applied, the trusts' income would still be taxable since the S corporation's corporate headquarters were in California, the underlying businesses based marketing and sales departments in California, and the S

[1]     Undesignated statutory references are to the Revenue & Taxation Code. Undesignated regulation references are to title 18 of the California Code of Regulations. As set out more fully below, section 17952 exempts from a nonresident's taxable California income any income from intangible property unless that property has acquired a "business situs" in this state or the "nonresident buys or sells such property in this state . . . so regularly, systematically, and continuously as to constitute doing business in this state."

2

corporation localized the goodwill in connection with its California business, giving the goodwill a "business situs" in this state.

Arguing the matter involves strictly a question of statutory interpretation, plaintiffs contend the trusts are not taxed on income earned from the sale of the intangible goodwill. They maintain the character of the goodwill income is determined under the Personal Income Tax Law (§ 17001 et seq.), not as business income under the Corporation Tax Law (§ 23001 et seq.), which are assertedly independent of one another and have different sourcing schemes. According to plaintiffs, a single item of income can have different characterizations under the two schemes, and here, it is business income under the Corporation Tax Law and income from intangible property that under section 17952 of the Personal Income Tax Law is not sourced to California. They further contend the goodwill does not have a business situs in California within the meaning of section 17952 so as to render the income taxable.

We hold that the nonresident trust shareholders of Pabst, a unitary multistate S corporation, are taxed on their pass-through pro rata share of the gain, which is business income sourced to California under the Uniform Division of Income for Tax Purposes Act (UDITPA or the Uniform Act; § 25120 et seq.). Our conclusion would not change even if the income could be characterized as from intangible goodwill within the meaning of section 17952, because we agree the goodwill acquired a business situs here, subjecting it to taxation in this state. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Many of the key background facts are undisputed. We state them from the parties' respective separate statements and the undisputed evidence in the record, viewing other facts in the light most favorable to plaintiffs. (See

3

*B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 178; *County of San Diego v. Superior Court* (2015) 242 Cal.App.4th 460, 467.)

In 2014, the Family Trust and the Evan Trust were respectively 20 percent and 39.5 percent shareholders of Pabst, a Delaware subchapter S corporation based in Connecticut. Pabst Holdings, Inc. is a wholly owned subsidiary of Pabst, and Pabst Brewing, as well as Falstaff Brewing Corporation, are wholly owned by Pabst Holdings, Inc. Pabst did business in California as Pabst Brewing. Pabst and its subsidiaries are what is termed a "unitary" business.[2]

In November 2014, Pabst sold Pabst Holdings, Inc. in a transaction that Pabst treated for tax purposes as an asset sale under the Internal Revenue Code. The sale resulted in a long-term capital gain that Pabst reported as apportionable business income on its 2014 corporate tax return. Pabst allocated 6.6 percent of that income to the State of California. The return identified over 99 percent of the long-term capital gain as from the sale of "brand [and] intangibles." (Capitalization omitted.)

As Pabst shareholders, the Family Trust and Evan Trust each received a California Schedule K-1 form for tax year 2014, listing their respective distributive shares of income from Pabst for that year. The trustee reported

---

[2] " 'A unitary business is generally defined as two or more business entities that are commonly owned and integrated in a way that transfers value among the affiliated entities.' " (*Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750, 756, fn. 3; see also *Jim Beam Brands Co. v. Franchise Tax Bd.* (2005) 133 Cal.App.4th 514, 519, fn. 1.) Such a business "receives income 'from or attributable to sources both within and without the state . . . .' " (*Apple, Inc. v. Franchise Tax Bd.* (2011) 199 Cal.App.4th 1, 9, quoting § 25101.) "[S]trong centralized management is important to the unitary business concept." (*Tenneco West, Inc. v. Franchise Tax Bd.* (1991) 234 Cal.App.3d 1510, 1526.)

4

the income as apportionable to California on the trusts' respective 2014 California Form 541 fiduciary income tax returns. The Family Trust and Evan Trust respectively paid $1,202,841 and $2,375,612 in taxes on the income received from the sale.

In June 2016, the trustee filed amended 2014 tax returns on behalf of the trusts, seeking refunds of the amounts paid. The FTB issued proposed denials of the requests in May 2017. The trusts then appealed the denials to the now Office of Tax Appeals.

Following a hearing on the matter, the Office of Tax Appeals issued a decision upholding the FTB's decision to deny the refunds. (*Appeals of Metropoulos Family Trust* (Cal. OTA, Nov. 7, 2019, Nos. 18010012, 180100013) 2019 WL 7565283.) Two of the three administrative law judges reasoned that regulation 17951-4 contained "an explicit set of instructions" requiring business income be apportioned at the S corporation level, then geographically sourced to California under regulation 17951-4(d) for multistate unitary S corporations.

In March 2020, the trustee and trusts filed this action against the FTB for a refund of the over $3.6 million in taxes they paid.[3] They alleged none of the income at issue was taxable under California law because the trusts were nonresidents: neither had a California resident fiduciary or California resident noncontingent beneficiaries at any relevant time. Alternatively, they alleged the income was not taxable even under the theory that the trusts' income was derived from California sources. In part, they alleged that Pabst realized capital gains from the sale of intangible personal property—

[3]     Plaintiffs acknowledge the trusts have no capacity to sue, be sued, or defend an action, but state they all brought the action in the event the FTB asserted either the trusts or the trustee lacked standing.

5

goodwill—and under S corporation pass-through rules (the so-called "conduit rule"), the trusts' pro rata share of that income was likewise realized from goodwill. They alleged that under section 17952 and this court's decision in *Valentino v. Franchise Tax Bd.* (2001) 87 Cal.App.4th 1284 (*Valentino*), that income was sourced for California income tax purposes to the nonresident trusts' out-of-state residence, and did not fall within the "business situs" exception to that rule so as to render it taxable here.

Plaintiffs and the FTB separately moved for summary judgment. Plaintiffs argued the nonresident trusts were only taxed on their California source income, and there was no dispute over 99 percent of the sale income was derived from intangible goodwill governed by section 17952, providing that income from intangible personal property is " 'not income from sources within this state . . . .' " Plaintiffs argued the goodwill did not acquire a business situs within the meaning of that statute because the trusts "did not possess or control the intangibles, or employ them in California in any localized manner."

The FTB did not dispute for purposes of its motion the nonresident status of the trusts. It argued that operation of the conduit rule meant that the trusts' income from the subsidiary's sale was business income because Pabst had characterized the income as apportionable business income on its tax return. That business income, the FTB argued, was taxed under section 17951 and corresponding regulation 17951-4. The FTB argued section 17952 did not apply to business income even if the business income was derived from intangible property, but if it did apply, the gain was taxable because the goodwill was used to do business in California. The FTB argued that the goodwill's business situs was determined with reference to the business—the operation of subsidiaries by the S corporation Pabst—not by the actions of the

6

trusts. Because Pabst had allocated 6.6 percent of its 2014 income to California operations, at least that much of the subsidiary's goodwill was " 'localized in connection with a business . . . in this State so that its substantial use and value attach to and become an asset of the business . . . in this State" within the meaning of regulation 17952(c).

The trial court denied plaintiffs' motion and granted the FTB's.[4] It ruled that S corporation shareholders are bound by however an S corporation chooses to characterize and allocate its income for tax purposes, and noted that tax regulations provided that business income is apportioned at the S corporation level, not the shareholder level. According to the court, because Pabst characterized the income at issue as business income, the trusts were bound to treat their respective shares of that income in the same way on their federal and California tax returns. The court ruled that the nonresident income was still taxable even assuming section 17952 applied because the goodwill acquired a business situs in California: "[T]here is evidence indicating that [Pabst] localized the goodwill in connection with its California business. Notably the [Metropoulos] family relocated its corporate headquarters to Los Angeles. In addition, the marketing and sales departments of Pabst Brewing and Falstaff Brewing were based in Los Angeles." It ruled that neither the applicable law nor *Valentino, supra*, 87 Cal.App.4th 1284 supported the trusts' contention that the court was to look to the trusts' use (or nonuse) of the goodwill to determine whether it had a business situs.

Plaintiffs appeal from the ensuing judgment in the FTB's favor.

---

[4] In doing so, the court granted the parties' requests for judicial notice and overruled their objections. Plaintiffs do not raise any evidentiary issues on appeal, so we may consider the matters judicially noticed and other evidence submitted by the parties.

## DISCUSSION

### I. *Standard of Review*

On review of a summary judgment, we " 'take the facts from the record that was before the trial court when it ruled on that motion. [Citation.] " 'we review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' " (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 39; *Steuer v. Franchise Tax Bd.* (2020) 51 Cal.App.5th 417, 424; *Swart Enterprises, Inc. v. Franchise Tax Bd.* (2017) 7 Cal.App.5th 497, 503.) The court does not weigh the plaintiffs' evidence or inferences against the defendant's evidence, but instead considers whether the evidence creates a triable issue of fact. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 856; *Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 113.)

Interpretation and application of tax statutes to uncontradicted facts presents a pure question of law that we review de novo. (*Steuer v. Franchise Tax Bd.*, *supra*, 51 Cal.App.5th at p. 423; *Swart Enterprises, Inc. v. Franchise Tax Bd.*, *supra*, 7 Cal.App.5th at p. 503.) We are not bound to accept the trial court's findings. (*Steuer*, at p. 423.) In interpreting a statutory scheme, we must ascertain the Legislature's intent so as to effectuate the purpose of the law. "To do so, we look first to the words of the statute itself, endeavoring to accord them their usual and ordinary meaning. We construe the language in the context of the statutory framework as a whole, always mindful of the policies and purposes underlying the enactment and endeavoring to read the language so as to conform to its spirit." (*Valentino*, *supra*, 87 Cal.App.4th at p. 1290, fn. 3; see *Younger v. Superior Court* (1978) 21 Cal.3d 102, 113 [" ' "It

is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend" ' "].)

As to tax statutes, courts " 'may not extend their provisions, by implication, beyond the clear import of the language used . . . .' " (*926 North Ardmore Ave.*, *LLC v. County of Los Angeles* (2017) 3 Cal.5th 319, 328.) To the extent a tax statute is unclear, it should be construed to favor the taxpayer. (*Ibid.*; *Microsoft Corp. v. Franchise Tax Bd.*, *supra*, 39 Cal.4th at p. 759; *California Motor Transp. Co. v. State Board of Equal.* (1947) 31 Cal.2d 217, 223-224.) But laws creating tax exemptions must be strictly construed against the taxpayer. (*Miller v. McColgan* (1941) 17 Cal.2d 432, 441-442.) When applying tax laws, courts look to realities; the nature of the transaction or actual rights and benefits, not labels. (*Microsoft Corp.,* at pp. 760-761.) "For purposes of taxation, what matters is substance, not form. 'In applying this doctrine of substance over form, the [United States Supreme] Court has looked to the economic realities of a transaction rather than to the particular form the parties employed.' " (*Id.* at p. 760.) Though courts bear ultimate responsibility for construing statutes (*Citicorp North America, Inc. v. Franchise Tax Bd.* (2000) 83 Cal.App.4th 1403, 1418), we accord great weight to the administrative construction of tax statutes. (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 524-525 (*Hoechst Celanese*); *Jim Beam Brands Co. v. Franchise Tax Bd.*, *supra*, 133 Cal.App.4th at p. 521; *Wilson v. Franchise Tax Bd.* (1993) 20 Cal.App.4th 1441, 1450.)

II. *Corporate Taxation of Unitary Businesses*

A discussion of the Uniform Act is necessary to address the arguments made by the parties and amicus. The law has been addressed in depth by our state's high court. (*The Gillette Co. v. Franchise Tax Bd.* (2015) 62 Cal.4th

468; *Microsoft Corp. v. Franchise Tax Bd., supra,* 39 Cal.4th 750; *General Motors Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 773; *Hoechst Celanese, supra*, 25 Cal.4th 508.)  The Uniform Act, codified in California in 1966 (*Gillette Co.*, *supra*, at p. 473), establishes rules governing the fair assessment of corporate taxes on unitary businesses operating in more than one state, as the parties concede Pabst is here.  (*Microsoft Corp.*, at pp. 754-756; see also *Apple, Inc. v. Franchise Tax Bd.*, *supra*, 199 Cal.App.4th at pp. 8-10; *Bunzl Distribution USA, Inc. v. Franchise Tax Bd.* (2018) 27 Cal.App.5th 986, 990-991.)  Under the Uniform Act, corporate income is divided into two categories based on the corporation's activities: business income, which is apportioned to each state via a formula, and nonbusiness income, which is generally allocated directly to the taxpayers' commercial domicile.  (*Microsoft Corp.*, at p. 756; *Hoechst Celanese, supra*, 25 Cal.4th at pp. 518-519 ["nonbusiness income is generally 'allocated in full to the state in which the taxpayer is domiciled' "]; see *Container Corp. of America v. Franchise Tax Bd.* (1983) 463 U.S. 159, 165 [discussing rationale of unitary business principle to multistate businesses]; *Harley-Davidson, Inc. v.*

*Franchise Tax Bd.* (2018) 27 Cal.App.5th 245, 251-252 [same].)[5]  The

Corporation Tax Law defines business income as

" ' "income arising from transactions and activity in the regular course of the

taxpayer's trade or business and includes income from tangible and

intangible property if the acquisition, management, and disposition of the

property constitute integral parts of the taxpayer's regular trade or business

operations.'  [Citation.]  ' "Nonbusiness income" means all income other than

business income.' "  (*Hoechst Celanese*, at p. 518, quoting § 25120, subds. (a),

(d).)  Tax treatment of corporate income thus depends on its classification as

business or nonbusiness income.  (*Id*. at p. 519.)

Corporate income from either tangible or intangible property can

become business income under a "transactional test," which focuses on the

income-producing transactions or activity, or a "functional test," focusing on

the income-producing property.  (*Hoechst Celanese*, *supra*, 25 Cal.4th at pp.

526-527.)  For the latter test, the "critical inquiry" is the nature of the

relationship between this property and the taxpayer's business operations.

---

[5]     "[T]he unitary business rule is a recognition of two imperatives: the
States' wide authority to devise formulae for an accurate assessment of a
corporation's intrastate value or income; and the necessary limit on the
States' authority to tax value or income that cannot in fairness be attributed
to the taxpayer's activities within the State." (*Allied-Signal, Inc. v. Director,
Div. of Taxation* (1992) 504 U.S. 768, 780.)  In *Hoechst Celanese, supra*, 25
Cal.4th 508, the court explained that under the unitary business formula
apportionment method, a state " 'calculates the local tax base by first defining
the scope of the "unitary business" of which the taxed enterprise's activities
in the taxing jurisdiction form one part, and then apportioning the total
income of that "unitary business" between the taxing jurisdiction and the rest
of the world on the basis of a formula taking into account objective measures
of the corporation's activities within and without the jurisdiction.' " (*Id*. at p.
517.)

(*Id*. at p. 527.)  Under the functional test, the "extraordinary nature or infrequency of the income-producing transaction is irrelevant" (*id*. at p. 530), but the income-producing property must be an "integral" part of the taxpayer's regular trade or business operations.  (*Id*. at p. 529.)  *Hoechst Celanese* explained the meaning of the term "integral" came from *Holly Sugar Corp. v. McColgan* (1941) 18 Cal.2d 218, which "held that losses suffered by a taxpayer from the forced liquidation of stock were apportionable because 'the stockholding in question was an integral part of [the taxpayer's] unitary sugar business.' [Citation.]  The stockholding was 'integral' because it could not 'reasonably be characterized as an extraneous investment separate and apart from the California business' of the taxpayer.  [Citation.]  Rather, 'the activities of the two companies' constituted 'one indivisible, composite whole, each portion giving value to every other portion.'  [Citation.]  Because of 'this organic unity of operation,' [the court] regarded the liquidation of the stockholding as an 'integral' part of the unitary business of the taxpayer." (*Hoechst Cenalese*, at pp. 531-532.)  Thus, "income is business income under the functional test if the taxpayer's acquisition, control and use of the property contribute materially to the taxpayer's production of business income.  In making this contribution, the income producing property becomes interwoven into and inseparable from the taxpayer's business operations." (*Id*. at p. 532.)

The distinctions of the Uniform Act are grounded in due process: Under the Due Process Clause of the United States Constitution, a state may not impose an income-based tax on " 'value earned outside its borders.' " (*Container Corp. of America v. Franchise Tax Bd.*, *supra*, 463 U.S. at p. 164; see also *Allied-Signal, Inc. v. Director, Div. of Taxation*, *supra*, 504 U.S. at pp. 777-778.)  "The Due Process and Commerce Clauses of the Constitution do

12

not allow a State to tax income arising out of interstate activities—even on a proportional basis—unless there is a ' "minimal connection" or "nexus" between the interstate activities and the taxing State, and "a rational relationship between the income attributed to the State and the intrastate values of the enterprise." ' " (*Container Corp.*, at pp. 165-166.)  When a business operates in more than one state, however, "arriving at precise territorial allocations of 'value' is often an elusive goal . . . ." (*Id.* at p. 165; accord, *Allied Signal*, at p. 778 [noting the "complications and uncertainties" in allocating income of multistate businesses to the several states].)  Hence, California uses the unitary business principle and apportionment approach to determine the portion of the income that the state has the power to tax. (*Container Corp.*, at p. 165.)

The principles discussed above require that the unitary business's out-of-state activities be "related in some concrete way to the [California] activities" such as where similar enterprises operate separately in various jurisdictions but are linked by "common managerial or operational resources that produce[ ] economies of scale and transfers of value." (*Container Corp. of America v. Franchise Tax Bd.*, *supra*, 463 U.S. at p. 166; see *MeadWestvaco Corp. ex rel. Mead Corp. v. Illinois Dept. of Revenue* (2008) 553 U.S. 16, 30 [" 'hallmarks' of a unitary relationship [are] functional integration, centralized management, and economies of scale"].)  California's Uniform Act "tracks in large part" these principles.  (*Container Corp.,* at p. 167.)

III.  *Taxation of Nonresidents Generally*

Under the Personal Income Tax Law, California taxes the gross income of nonresident taxpayers "derived from sources within this state," i.e.,

13

California source income. (§§ 17041 subd. (i)(1)(B), 17951;[6] *Steuer v. Franchise Tax Bd.*, *supra*, 51 Cal.App.5th at p. 424; *Valentino*, *supra*, 87 Cal.App.4th at p. 1290; see also *Newman v. Franchise Tax Bd.* (1989) 208 Cal.App.3d 972, 977; Reg. 17951-1.) For purposes of computing the taxable income of a nonresident who has gross income from sources both within and without this state (*Newman*, at p. 977), the income "shall be allocated and apportioned under rules and regulations prescribed by the Franchise Tax Board." (§ 17954.[7]) Under this legislative grant of "rulemaking authority" (*Wilson v. Franchise Tax Bd.*, *supra*, 20 Cal.App.4th at p. 1447), the FTB enacted regulations specifying types of income from sources within this state (Reg. 17951-2), as well as regulations dealing with how to treat intangible personal property (Reg. 17952) and nonresident income from a business, trade or profession (Reg. 17951-4).[8]

---

[6] Section 17951 provides in part: "(a) For purposes of computing 'taxable income of a nonresident . . .' under paragraph (1) of subdivision (i) of Section 17041, in the case of nonresident taxpayers the gross income includes only the gross income from sources within this state."

[7] Section 17954 originally appeared in the Personal Income Tax Act of 1935, section 7, subdivision (f) as follows: "In the case of taxpayers other than residents the gross income includes only the gross income from sources within this State. Gross income from sources within and without this State shall be allocated and apportioned under rules and regulations to be prescribed by the commissioner." (Stats. 1935, ch. 329, § 7, p. 1094.)

[8] The trusts state without citation that regulation 17951-4 "was promulgated under Section 17954." However, the regulation cites as statutory references not just section 17954, but also sections 17041, 17951 and 25128, the latter of which addresses the Uniform Act's apportionment of business income. (Reg. 17951-4.)

The FTB defines income from sources within this state to include in-state business income—income "from a business . . . carried on within this state"—as well as income from "goodwill, trademarks, [or] trade-brands having a taxable or business situs in this State." (Reg. 17951-2.) FTB regulations further address when business income is or is not derived from sources within this state. (Reg. 17951-4.) These regulations cover nonresidents whose business income is derived either wholly outside or wholly inside the state (Reg. 17951-4(a)), nonresidents whose business income is not unitary, but conducted partly within and partly without the state (Reg. 17951-4(b)), nonresident unitary sole proprietorships (Reg. 17951-4(c)), partners in partnerships (Reg. 17951-4(d)), and nonresident shareholders of S corporations that carry on a unitary business inside and outside of California—like Pabst here (Reg. 17951-4(f)).

The latter regulation 17951-4(f) provides: "If a nonresident is a shareholder of an S corporation . . . which carries on a unitary business . . . within and without this state, the amount of the nonresident's pro rata share of S corporation income derived from sources within this state shall be determined in the same manner as if the S corporation were a partnership." (Reg. 17951-4(f).) Regulation 17951-4(f) incorporates the partnership rule for unitary businesses which states that "the source of the partner's distributive share of partnership income derived from sources within this state shall be determined in the manner described below. [¶] (1) Except as provided, *the total business income of the partnership shall be apportioned at the partnership level in accordance with the apportionment rules of the* [*Uniform Act*], Sections 25120 to 25139 . . . and the regulations thereunder. [¶] . . . [¶] (4) The source of a partner's distributive share of items which do not constitute business income shall be determined in accordance with the

15

sourcing rules of Sections 17951 through 17955 . . . and the regulations thereunder, as if the income producing activity were undertaken by the partner in its individual capacity."  (Reg. 17951-4(d), italics added.)

Section 17952 and its accompanying regulation address taxation of a nonresident taxpayer's income from intangible personal property.  For purposes of computing a nonresident's taxable income, "income . . . from stocks, bonds, notes, or other intangible personal property is not income from sources within this state unless the property has acquired a business situs in this state . . . ."  (§ 17952.[9])  The FTB's regulation states that "intangible personal property has a business situs in this State if it is employed as capital in this State or the possession and control of the property has been localized in connection with a business, trade or profession in this State so that its substantial use and value attach to and become an asset of the business, trade or profession in this State."  (Reg. 17952(c).)  Further, if a nonresident's intangible personal property has acquired a business situs in California, "the entire income from the property including gains from the sale thereof, regardless of where the sale is consummated, is income from sources within this State, taxable to the nonresident."  (Reg. 17952(c).)

---

[9]     The rule is subject to another exception where "a nonresident buys or sells such property in this state or places orders with brokers in this state to buy or sell such property so regularly, systematically, and continuously as to constitute doing business in this state" in which case "the profit or gain derived from such activity is income from sources within this state irrespective of the situs of the property."  (§ 17952.)  The FTB suggests this exception broadly applies to "gains [that] reflect business income . . . ."  We are not convinced that this provision is so encompassing, as it requires the systematic or continuous buying or selling of "such property," i.e., intangibles. There was no evidence presented in the summary judgment papers that Pabst regularly buys or sells intangible property or derived profit or gain from repeated transactions in intangibles.  Its sale was a one-time event, so this portion of the statute has no application.

The nonresident intangible property rule of section 17952 derives from the common law concept of *mobilia sequuntur personam* (movables follow their owner) and its equally "well-settled" exception. (See *Milhouse v. Franchise Tax Bd.* (2005) 131 Cal.App.4th 1260, 1269; *Holly Sugar Corp. v. McColgan, supra*, 18 Cal.2d at p. 223; *Miller v. McColgan, supra*, 17 Cal.2d at pp. 443-444 [business situs exception is "well-established"].)[10] This court explained the *mobilia* doctrine in *Milhouse v. Franchise Tax Bd.*, citing United States Supreme Court authority addressing its exception: " 'In cases where the owner of intangibles *confines his activity to the place of his domicile* it has been found convenient to substitute a rule for a reason, [citations], by saying that his intangibles are taxed at their situs and not elsewhere, or, perhaps less artificially, by invoking the maxim *mobilia sequuntur personam*, [citations], which means only that it is the identity or association of intangibles with the person of their owner at his domicile which gives jurisdiction to tax.' " (*Milhouse*, at p. 1269, some italics added, quoting *Curry v. McCanless* (1939) 307 U.S. 357, 367.) "But when the taxpayer extends his activities with respect to his intangibles, so as to avail himself of the protection and benefit of the laws of another state, in such a way as to bring his person or property within the reach of the tax gatherer there, the reason for a single place of taxation no longer obtains . . . . [C]onsequently[,] there are many circumstances in which more than one state may have

_____

10    The language that eventually became section 17952 was added in a 1937 amendment of section 7, subdivision (f) of the Personal Income Tax Act of 1935, and has remained largely unchanged with the exception of a 2001 amendment adding the phrase, "For purposes of computing 'taxable income of a nonresident or part-year resident' . . . ." (See Stats. 1937, ch. 668, § 4; Stats. 2001, ch. 920, § 20.)

17

jurisdiction to impose a tax and measure it by some or all of the taxpayer's intangibles.

. . . The taxpayer who is domiciled in one state but carries on business in another is subject to a tax there measured by the value of the intangibles used in his business." (*Curry*, at pp. 367-368.)

IV. *Pass-Through Taxation of S Corporation Shareholders*

An S corporation for federal income tax purposes is an S corporation for purposes of both the Personal Income Tax Law and the Corporation Tax Law, and its shareholders will be S corporation shareholders without regard to whether the corporation is qualified to do business or is incorporated in this state (§ 23801, subd. (b).) The Corporation Tax Law provides that the Internal Revenue Code provisions for S corporations and their shareholders apply in this state *"except as otherwise provided."* (§ 23800, italics added; see *Valentino, supra,* 87 Cal.App.4th at p. 1290; *Heller v. Franchise Tax Bd.* (1994) 21 Cal.App.4th 1730, 1735.) Likewise, the Personal Income Tax Law states that provisions of the Internal Revenue Code relating to tax treatment of S corporations and their shareholders apply, *"except as otherwise provided under this part [the Personal Income Tax Law] or Part 11 [the Corporation Tax Law]."* (§ 17087.5.[11]) The meaning of the "except as otherwise provided"

_____

[11] In full, section 17087.5 provides: "Subchapter S of Chapter 1 of Subtitle A of the Internal Revenue Code [26 U.S.C.A. § 1361 et seq.], relating to tax treatment of 'S corporations' and their shareholders, shall apply, except as otherwise provided under this part or Part 11 (commencing with Section 23001)." (§ 17087.5.) When the statute was originally added to the code in 1987 (Stats. 1987, ch. 1139, § 3), it provided: "In determining his or her gross income, each shareholder of an S corporation shall take into account amounts required to be recognized by the shareholder under Chapter 4.5 (commencing with Section 23800) of Part 11." The statute was repealed and rewritten in 1993 to incorporate federal Internal Revenue Code

proviso is plain: it introduces a condition or exception. (See, e.g., *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 697-698 [referring to similar provision as an "exception clause"]; *Cerini v. De Long* (1908) 7 Cal.App. 398, 408-409.) Thus, the Personal Income Tax Law and the Corporation Tax Law, which includes the apportionment and sourcing of business income under the Uniform Act, override inconsistent provisions of the Internal Revenue Code as to S corporations and their shareholders.

An S corporation "generally does not pay taxes as an entity. [Citation.] 'Rather, the S corporation files only an informational return reporting for the taxable year its gross income (or loss) and deductions, its shareholders, and the shareholders' pro rata shares of each item. [Citation.] The items are then "passed through" on a pro rata basis to the shareholders, who report them on their personal income tax returns. [Citations.] "The S corporation is, in effect, a Code-created hybrid combining traits of both corporations and partnerships." ' " (*Valentino*, *supra*, 87 Cal.App.4th at pp. 1288-1289, quoting *Heller v. Franchise Tax Bd.*, *supra*, 21 Cal.App.4th at p. 1733; see also *Mass v. Franchise Tax Bd.* (2019) 38 Cal.App.5th 959, 968-969 (conc. opn. of Lavin, J.).)

With respect to an S corporation shareholder, "following federal tax law, the character of a shareholder's pro rata share of S corporation income is determined as if the income were realized directly from the source from which realized by the corporation." (*Valentino*, *supra*, 87 Cal.App.4th at p. 1290.) That is, "while the S corporation's items of income, loss, deductions and credit are *taxed* at the shareholder level, the *character* of those items is

---

provisions relating to tax treatment of S corporations and their shareholders. (Stats. 1993, ch. 873 (A.B. 35), §§ 6, 7.)

determined at the corporate level. . . . 'Each item of corporate income and expense is "passed through" to the shareholders in exactly the same form as received by the corporation—i.e., as ordinary income or loss, capital gain or loss, tax credits, charitable contributions, etc.' " (*Heller v. Franchise Tax Bd.*, *supra*, 21 Cal.App.4th at p. 1736.) The federal tax law is 26 United States Code section 1366(b), which provides: " 'The character of any item included in a shareholder's pro rata share under paragraph (1) of subsection (a) shall be determined as if such item were realized directly from the source from which realized by the corporation, or incurred in the same manner as incurred by the corporation.' " (*Valentino*, 87 Cal.App.4th at p. 1290, fn. 4.) "This principle is known as the 'conduit rule' and was intended by Congress to be the same as the partnership rule. [Citations.] 'As in the case of nonresident partners, nonresident S corporation shareholders may be taxed by a state only to the extent the income claimed to be subject to tax is *fairly attributable to activities of the S corporation in the taxing state*.' " (*Id.* at p. 1290, italics added.)

This court applied the conduit rule in *Valentino*, *supra*, 87 Cal.App.4th 1284, which the parties discuss at length. In *Valentino*, the taxpayers, a married couple residing in Florida, owned stock in Cellular 2000 Telephone Company, Inc. (Cellular 2000), a Delaware S corporation that did business in California and paid franchise taxes on its net income derived from California sources for three tax years. (*Id.* at p. 1286.) The Valentinos paid the taxes and interest for those years after the FTB assessed them, then sued to obtain a refund. (*Id.* at p. 1287.) Their matter proceeded to a bench trial on stipulated facts, after which the court entered judgment in the FTB's favor. (*Ibid.*)

20

The question on appeal was whether the S corporation's California source income passed through to the Valentinos was properly taxed in California. (*Valentino*, *supra*, 87 Cal.App.4th at p. 1286.) The Valentinos had argued in the trial court that as nonresidents, they were not required to pay a tax on income derived from intangible property—the stock of the foreign S corporation doing business in California—unless the stock itself acquired a business situs in California. (*Id*. at p. 1287.) In *Valentino*, there was no dispute that the income earned by the S corporation was derived from business conducted entirely within California. (*Id*. at p. 1291.) This court explained that under the conduit rule, the Valentinos' pro rata share of the S corporation's income was characterized as if the income were realized directly from the source from which realized by the corporation, and thus the Valentinos "are treated as though they conducted business wholly within California in their individual capacities. [Citation.] This *attribution of business activity* parallels the treatment of nonresident aliens as being engaged in a trade or business within the United States where the partnership of which such individual is a member is so engaged. [Citation.] Thus, an S corporation shareholder's income is characterized by reference to the corporate-income-producing activity and, once characterized, the items are then sourced according to the particular sourcing rule applicable to each type of income." (*Ibid*., italics added.) Under these rules, the Valentinos were required to report the income from Cellular 2000 as gross income from sources within California. (*Ibid*.)

This court rejected the Valentinos' reliance on the *mobilia* doctrine to place the source of the income as from the Cellular 2000 stock, rather than from the company's business activities conducted within California: "Granted, section 17952 and the *mobilia* doctrine provide that income of

nonresidents from intangibles, such as stock, does not generally have a source in California. However, Internal Revenue Code section 1366(b) characterizes S corporation income as to the shareholder by reference to its character *as to the corporation*, not as income from stock." (*Valentino*, *supra*, 87 Cal.App.4th at p. 1291, italics added.) We explained a shareholder's pro rata share of S corporation income is not income from stock in the same sense as dividends and gain from the sale of stock. "Rather, such income is *corporate income derived directly from corporate activities* and passed through and taxed at the shareholder level as if the shareholder earned the income in his or her individual capacity." (*Id*. at pp. 1291-1292, italics added.) "[T]he attribution of Cellular 2000 income to the Valentinos was determined by their percentage of ownership of the outstanding shares, income that was derived from the tangible sources from which the corporation received it and not from the intangible shares themselves. Consequently, section 17952 never applies to a shareholder's share of S corporation income unless the corporate income itself is derived from intangibles." (*Id*. at p. 1292.)

In response to a claim that the Legislature did not intend to apply the same sourcing rules for partnerships to S corporation shareholders, this court further observed that the "*Legislature intended the income be sourced to locations where the corporation conducted business*" as evidenced by two statutes that reflected it (1) sought to provide S corporation shareholders a mechanism to simplify the reporting of such income, and (2) facilitated California taxation of income attributable to California sources. (*Valentino*, *supra,* 87 Cal.App.4th at p. 1293 [italics added, discussing sections 18535 and 23801].) We held our interpretation was consistent with long-standing treatment of partnerships, to which taxation of S corporations conforms

including as to sourcing matters. (*Id*. at p. 1295, citing §§ 17951, 23800.) And we looked to the regulation (Reg. 17951-1(b)) providing that the gross income of a nonresident member of a partnership includes his or her distributive share of the taxable income of the partnership to the extent it is derived from sources within California. (*Valentino*, at p. 1295.)

Based on our statutory interpretation we held "the Legislature intended the source of S corporation pass[-]through income be determined by reference to corporate-income-producing activities. That is, the source of a shareholder's pro rata share of S corporation income is first characterized by reference to corporate-income-producing-activities under Internal Revenue Code section 1366(b), and then as characterized is sourced to locations according to the rule that applies to that type of income." (*Valentino*, *supra*, 87 Cal.App.4th at p. 1296.) We further concluded this interpretation "harmonizes Internal Revenue Code section 1366(b) with section 17952, by applying the latter to income characterized at the corporate level as income from intangibles. . . . [S]ection 17952 is not displaced by Internal Revenue Code section 1366(b), because it continues to apply in those situations it did before the enactment of the S corporation provisions—that is, to determine the source of stock dividends and income from the sale of stock." (*Id*. at p. 1296.)

*Valentino* did not involve a unitary corporation doing business both inside and outside California, as the corporation in that case did business wholly within this state. And when *Valentino* was decided, FTB regulations did not address the scenario of nonresident S corporation shareholders' pro rata share of business income. (*Valentino*, *supra*, 87 Cal.App.4th at pp. 1295-1296.) Following that decision, the FTB adopted the regulations referenced above (Reg. 17951-4(f)) addressing nonresident shareholders of S corporations

23

carrying on unitary business, as Pabst does here. The regulation specifies that the income derived from sources within this state shall be determined in the same manner as if the S corporation were a partnership, and that business income shall be apportioned at the partnership level in accordance with the Uniform Act's apportionment rules and regulations. (Reg. 17951-4,(f).) As we explain, these characterization and sourcing rules govern the taxation of the nonresident shareholder trusts in this case.

V. *The Shareholder Trusts are Taxed on their Passed-Through Distributive Pro Rata Share of S Corporation Unitary Business Income Sourced to California Under the Uniform Act*

For purposes of summary judgment, there is no dispute that the trusts are nonresident shareholders of the subchapter S corporation, Pabst. Additionally, plaintiffs concede that Pabst is a unitary business and that the gain realized from Pabst's asset sale is business income apportionable 6.6 percent to California. The FTB does not dispute that Pabst's 6.6 percent apportionment to California fairly represents the extent of Pabst's business in California.

There is import to plaintiffs' concession. As summarized above, business income of a unitary business includes income from intangible property—such as the goodwill here—if the acquisition, management, and disposition of the intangible constitute integral parts of the taxpayer's regular trade or business operations. (*Hoechst Celanese*, *supra*, 25 Cal.4th at p. 518.) Pabst's corporate income, including income from intangibles, became business income to it based on the nature of the relationship between the intangible and its business operations. (*Id.* at p. 527.) The "extraordinary nature or infrequency of the income-producing transaction is irrelevant" (*id.* at p. 530) so Pabst's one-time asset sale of goodwill qualifies. Plaintiffs

24

therefore concede the goodwill was used as an integral part of Pabst's California business and related to its California business activities, at least for purposes of Pabst's taxation. In other words, the goodwill "contributed materially to [Pabst's] production of business income" and thus became "interwoven into and inseparable from [Pabst's] business operations." (*Hoechst Celanese*, at pp. 529, 532.)[12]

What plaintiffs dispute is whether the sourcing criteria of regulation 17951-4 apply to the trusts. They contend that *Valentino, supra*, 87 Cal.App.4th 1284 requires us to conclude the gain is goodwill income that must be allocated 100 percent outside California under section 17952, and only Pabst was required to treat the intangible goodwill income as taxable business income in California. They maintain the Personal Income Tax Law does not include business income as a category in its sourcing provisions (sections 17951 through 17955); that the Legislature knows how to incorporate provisions of the Corporation Tax Law into the Personal Income Tax Law when it desires, and thus would not incorporate the term "business income" by implication; and that the Personal Income Tax Law and Corporation Tax Law therefore "must be interpreted independently of each

---

[12]  The State Board of Equalization has observed that goodwill is a business asset "so essential to the viable conduct of a business that it has been held to be inseparable from the business as a whole." (*Appeal of Borden, Inc.* (Cal.St.Bd.Eq. 1977) [1977 WL 3818, *4], citing *Grace Bros. v. C.I.R.* (9th Cir. 1949) 173 F.2d 170, 175-176; see also *Peerless Investment Co. v. Commissioner of Internal Revenue* (1972) 58 T.C. 892 ["where a corporation continues its business, goodwill remains its asset, because goodwill is incident to an ongoing business, and cannot be transferred unless the business is transferred"]; 26 C.F.R. § 1.197-2(b)(1) [defining goodwill as "the value of a trade or business attributable to the expectancy of continued customer patronage. This expectancy may be due to the name or reputation of a trade or business or any other factor"].)

other unless one expressly references the other." Given the different sourcing schemes, they argue, the income is characterized for Pabst as business income, and as income from intangible property for them under the Personal Income Tax Law.

The FTB contends the gain from the asset sale is characterized at the corporate level as apportionable business income, the income retained that character when passed to the trusts, then it is sourced to California according to regulation 17951-4 governing S corporation nonresident shareholders of a unitary business. Thus, it argues, since Pabst apportioned 6.6 percent of its 2014 income to California, the trusts must pay California tax on their respective shares of that amount. It maintains that treating the gain as income from intangible property ignores the conduit rule and the pass-through nature of an S corporation.

We see plaintiffs' statutory interpretation arguments in a different light. They cite the rule that ambiguous tax statutes are to be construed in the taxpayer's favor, and argue that if we were to find both parties' interpretations of section 17952 reasonable, we must resolve the ambiguity created by that construction in their favor. But the trusts would have us view the Personal Income Tax Law and its provisions to the exclusion of the Corporation Tax Law with respect to the geographic sourcing of S corporation unitary business income so as to take the trusts' income outside of the Uniform Act. In other words, though they concede the Uniform Act applies to apportion Pabst's unitary business income to California, they seek to exempt themselves from taxation under that scheme. Such exemptions are to be construed strictly against the taxpayer, and will not be inferred from doubtful language. (*Miller v. McColgan, supra*, 17 Cal.2d at pp. 441-442; *Dicon Fiberoptics, Inc. v. Franchise Tax Bd.* (2012) 53 Cal.4th 1227, 1241; *In re*

26

*Simpson's Estate* (1954) 43 Cal.2d 594, 597; see *Weber v. Santa Barbara County* (1940) 15 Cal.2d 82, 87-88.)  In the context of the trusts' position that they are exempt from pass-through business income taxation, doubts must be resolved in the FTB's favor, not the plaintiffs'.

Applying these principles compels us to agree with the FTB.  We are not persuaded by plaintiffs' construction of the Personal Income Tax Law such that the gain from the sale of intangible goodwill cannot be business income.  For purposes of that scheme, FTB regulations explain that California source gross income of nonresident taxpayers encompasses business income ("income from a business . . . carried on within this State"). (§ 17951, Reg. 17951-2.)  Section 17087.5 incorporates and elevates provisions of the Personal Income Tax Law and the Corporation Tax Law for S corporations and their shareholders over inconsistent federal subchapter S provisions.  For a unitary S corporation with income from inside and outside California, the IRS S corporation flow-through rules yield to the Corporation Tax Law's Uniform Act provisions and the FTB's regulations.  (§ 17954; Reg. 17951-4).

The gain realized by Pabst passes through to the shareholder trusts "in exactly the same form as received by the corporation" (*Heller v. Franchise Tax Bd.*, *supra*, 21 Cal.App.4th at p. 1736) or as if "incurred in the same manner as incurred by the corporation" (26 U.S.C. § 1366(b); see *Valentino*, *supra*, 87 Cal.App.4th at pp. 1290-1291).  Because the gain from the asset sale of goodwill is undisputedly business income to Pabst, it remains business income for purposes of sourcing the trusts' pro rata share of that income. This follows too from the realities of the situation, where the goodwill is a business asset inseparable from the business itself.  And pursuant to the

Legislature's express grant of power to make apportionment rules for nonresident gross income from sources within and without California (§ 17954), FTB regulation 17951-4—as to a nonresident shareholder's distributive share of unitary S corporation income derived from sources within this state—governs. (Reg. 17951-4(d), (f).) The income from Pabst is thus characterized at the S corporation level as either business or nonbusiness income; the business income is apportioned under the Uniform Act, and the nonbusiness income is sourced under sections 17951 through 17953 and 17955. (Reg. 17951-4(d).) The unitary business principles discussed above apportion business income so as to fairly represent Pabst's business activities in California. This is consistent with our holding in *Valentino* that " 'nonresident S corporation shareholders may be taxed by a state only to the extent the income claimed to be subject to tax is *fairly attributable to activities of the S corporation in the taxing state.*' " (*Valentino*, *supra*, 87 Cal.App.4th at p. 1290.)

Plaintiffs argue against this result, contending application of section 17954, which it characterizes as a "catch-all" provision, and regulation 17951-4 must yield to section 17952 governing intangible property. They reason that section 17952 as a specific statute trumps a general one. But we agree with the FTB that because the Legislature granted it substantive rule-making power in section 17954, its regulation 17951-4—which is specific as to nonresident S corporation shareholder distributive share of income—is "to be accorded the same dignity" as a statute such that it does not subordinate to section 17952. (*Donohue v. AMN Services, LLC* (2021) 11 Cal.5th 58, 66; *Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 408, 414-415 [FTB regulation as to how petroleum refinery property should be valued for taxation purposes, statutorily authorized by Legislature,

involved exercise of the FTB's discretion to evaluate whether such property warranted a special rule and thus was a quasi-legislative rule having the dignity of a statute]; *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10.) Even if we assume these provisions are irreconcilable, as between laws generally sourcing nonresident gross income of intangibles and one sourcing income of nonresident shareholders of S corporations carrying on a unitary business, the latter controls over the former. (*State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 960; *Arterberry v. County of San Diego* (2010) 182 Cal.App.4th 1528, 1536.)

In reply, plaintiffs further argue that section 17954 applies only to income from sources "within and without" California, which cannot be the case here because section 17952 provides that Pabst's goodwill income cannot have a source "within and without" California unless it has a business situs within California, in which case it is sourced wholly within California. Setting aside that this is a new theory impermissibly raised for the first time in reply, it is based on the incorrect premise that the gain must be characterized as goodwill. Because Pabst is a unitary S corporation, the FTB apportionment rules apply to source its business income. (§ 17954.)

While *Valentino* did not involve a unitary business like Pabst, it nevertheless informs our decision. Plaintiffs acknowledge that the nonresident taxpayers in *Valentino* could not characterize Cellular 2000's corporate income as income from an intangible because the company derived the income from its business operations, which took place entirely within California. The pass-through concept expressed in *Valentino* was the "attribution of [Cellular 2000's] business activity" to the shareholders. (*Valentino, supra,* 87 Cal.App.4th at p. 1291.) In this case, unlike Cellular 2000 in *Valentino*, Pabst conducted its business both inside and outside of

29

California; that unitary business activity is attributed to the trust shareholders here, who must characterize the corporate income—whether from tangibles or intangibles—as business income that is then sourced to California under the apportionment rules of the Uniform Act. The Personal Income Tax Law requires use of the allocation and apportionment regulations, which override inconsistent federal S corporation sourcing rules. (§§ 17087.5, 17954.) The S corporation shareholders in *Valentino* were not subject to apportionment rules. To the extent *Valentino* addressed section 17952's operation or the sourcing of intangibles, it was limited to stock dividends and income from the sale of stock (*Valentino*, at p. 1296), not unitary business income stemming from intangible goodwill.

VI. *The Goodwill Acquired a Business Situs In this State*

Our conclusion above disposes of the trusts' contention that Pabst's income must be characterized as goodwill income governed by section 17952. But even if we were to agree with the trusts on that point, the outcome would remain the same.

As stated above, section 17952 derives from the *mobilia* doctrine and its exception, under which there may be a "business situs" of intangibles distinct from the owner's domicile. (*Miller v. McColgan*, *supra*, 17 Cal.2d at p. 444.) Under those principles, if we conclude as a matter of law the goodwill and brand associated with Pabst's subsidiary acquired a business situs in California, then the income reported by the trusts is taxable. The trusts contend the business situs exception is a rule of allocation, meaning that if it applies, 100 percent of the goodwill income must be held taxable as from a source within this state, violating due process and commerce clause principles. The trusts further argue they did not do anything affirmative to localize the goodwill in California so as to give it a business situs. They

30

concede that Pabst's goodwill has connections to California, but argue its use and value extended far beyond this state, and thus it did not acquire a business situs here.

The issue is a question of law on these facts, because situs is a legal term of art. (See Black's Law Dictionary (11th ed. 2019), p. 1668 [defining the term "situs" as "[t]he location or position (of something) for legal purposes"].) For taxation purposes, "situs" refers to where an intangible asset is appropriately subject to taxation. (See *First Bank Stock Corp. v. State of Minnesota* (1937) 301 U.S. 234, 240-241 [the notion of situs is a way of "symbolizing . . . those considerations which are persuasive grounds for deciding that a particular place is appropriate for the imposition of [a] tax"]; *Wheeling Steel Corp. v. Fox* (1936) 298 U.S. 193, 209-210.)

In proper situations, income from intangible assets may be taxed in multiple jurisdictions on the basis that a taxpayer avails itself of the services, benefits and protections of a state. (*Curry v. McCanless*, *supra*, 307 U.S. at pp. 367-368.) The California Supreme Court has held the *mobilia* rule will not apply when an owner has "divided his activities" to a place separate from his domicile by "engag[ing] in business in the [nondomiciliary state]" so as to bring himself within the exception. (*Miller v. McColgan*, *supra*, 17 Cal.2d at p. 444.) A nondomiciliary state may tax intangible income where the capital that produces the income is in the nondomiciliary state. (*Milhouse v. Franchise Tax Bd.*, *supra*, 131 Cal.App.4th at p. 1269.) The exception may be found when the property has become "an integral part of some local business." (*Holly Sugar Corp. v. McColgan*, *supra*, 18 Cal.2d at p. 223.) The exception "arises because 'when the taxpayer extends his activities with respect to his intangibles, so as to avail himself of the protection and benefit of the laws of another state, in such a way as to bring his person or property

31

within the reach of the tax gatherer there, the reason for a single place of taxation no longer obtains.' " (*Milhouse*, 131 Cal.App.4th at p. 1269, quoting *Curry,* at p. 367.)  The basic underlying theory is that a state's power to tax is based on the protections and benefits it confers.  (*State Tax Commission of Utah v. Aldrich* (1942) 316 U.S. 174, 181-182 ["there is no constitutional rule of immunity from taxation of intangibles by more than one State.  . . . Another State which has extended benefits or protection . . . may likewise constitutionally make its exaction"]; see *Allied-Signal*, *Inc. v. Director*, *Div. of Taxation*, *supra*, 504 U.S. at p. 778 [state's power to tax is based on the " 'protection, opportunities and benefits' [it] confers on those activities"]).  "The simple but controlling question is whether the state has given anything for which it can ask return."  (*State of Wisconsin v. J.C. Penney Co.* (1940) 311 U.S. 435, 444; *ASARCO Inc. v. Idaho State Tax Com'n* (1982) 458 U.S. 307, 315; *North Carolina Department of Revenue v. The Kimberley Rice Kaestner 1992 Family Trust* (2019) ____ U.S. ___, ___ [139 S.Ct. 2213, 2220].)

Here, Pabst's apportionment of a percentage of its business income to California under the Uniform Act—the propriety of which the trusts do not dispute—meant that the management and disposition of the intangible property making up that income constituted an integral part of Pabst's regular trade or business operations.  (*Hoechst Celanese, supra*, 25 Cal.4th at p. 518.)  It follows that the goodwill acquired a situs in California and the income from it is taxable in California.

Amicus California Taxpayer's Association cites *Holly Sugar Corp. v. McColgan*, *supra*, 18 Cal.2d 218 and other cases to support the trusts' position that the goodwill here did not acquire a California business situs because its substantial use and value did not attach to or become an asset of the business.  *Holly Sugar* involved a plaintiff New York corporation with its

principal office in Colorado.  (*Holly Sugar Corp. v. McColgan*, *supra*, 18 Cal.2d at p. 222.)  The plaintiff (Holly Sugar Corporation or Holly Sugar), which grew sugar beets and marketed and refined the beet sugar, was, like Pabst here, a unitary business doing business within and without California.  (*Ibid*.)  It purchased 70 percent of the total outstanding capital stock of a California corporation (Santa Ana Sugar Company or Santa Ana), which was engaged in the same sugar beet business.  (*Id*. at pp. 221-222.)  The issue in *Holly Sugar* on the Franchise Tax Commissioner's demurrer was whether Holly Sugar was entitled to deduct a loss from liquidating Santa Ana's stock.  (*Ibid*.)

The California Supreme Court held "the integration of the operations of the Santa Ana Sugar Company with the activities of appellant's multistate sugar business fixed the situs of the stock loss in California and established the propriety of the claimed deduction." (*Holly Sugar Corp. v. McColgan*, *supra*, 18 Cal.2d. at p. 222.)  According to the court, "the stockholding in question was an integral part of [Holly Sugar's] unitary sugar business" (*id*. at p. 225) and thus the loss was to be included in the tax base for purposes of "ascertaining that portion of [Holly Sugar's] net income 'derived from business done within this state.' " (*Ibid*.)  The court relied on the business situs exception to the *mobilia sequuntur personam* doctrine, explaining "[b]usiness situs arises from the act of the owner of the intangibles in employing the wealth represented thereby, as an integral portion of the business activity of the particular place, so that it becomes identified with the economic structure of that place and loses its identity with the domicile of the owner." (*Id*. at p. 224.)  The "economic integration with local commercial activities" was "definitive of business situs." (*Ibid*.)  Holly Sugar's 70 percent stockholding in Santa Ana could not reasonably be characterized as an

33

"extraneous investment separate and apart from" its California business as both entities were engaged in precisely the same type of enterprise. (*Ibid*.) Further, Holly Sugar acted with the object of controlling Santa Ana's policies and operations so as to use Santa Ana as an adjunct, agency or instrumentality in the conduct of its unitary business. (*Ibid*.) Given the "organic unity of operation," Holly Sugar's stockholding "was an integral part of [its] unitary sugar business" and thus the loss was to be included for purposes of ascertaining the portion of net income derived from business done within California. (*Id*. at p. 225; see also *Hoechst Celanese*, *supra*, 25 Cal.4th at pp. 531-532 [summarizing *Holly Sugar* and using it to give meaning to the term "integral" in the context of business income of a unitary business].)

Amicus points to the *Holly Sugar* taxpayer's purchase of 70 percent of the California company's stock, and argues that because here the "overwhelming majority of [Pabst's] goodwill" was used outside California, the substantial use and value standard cannot be met such that the "entire goodwill" did not acquire a business situs here. But *Holly Sugar*'s outcome does not depend on the fact that the unitary nonresident corporation had purchased more than a majority interest in the California corporation; it was the *integration and unity of the California business's operation with its own* that made the loss fall within the business situs exception to the *mobilia* doctrine. So it is here, where Pabst's integration of the goodwill into its

34

California business operations gives that intangible a business situs in this state.[13]

We turn to plaintiffs' assertion that the business situs exception is a rule of allocation. They say it would allocate 100 percent of Pabst's goodwill to California even though it is used in a multistate business, and thus the exception cannot constitutionally be applied here because it would tax extraterritorial values.[14] The United States Supreme Court has recognized

[13]    We observe that in addition to serving as highly paid officers of Pabst Brewing and Falstaff Brewing Corporation, Evan and Daren, assisted by others, ran Pabst Brewing from Los Angeles as co-Chief Executive Officers. Daren and Evan were both California residents in 2014. They represented that as co-CEOs, they had increased national distribution and created double digit sales growth for the beer brands under their stewardship, and increased "EBITDA [earnings before interest, taxes, depreciation and amortization; see *In re Marriage of Honer* (2015) 236 Cal.App.4th 687, 695] from $35 million to more than $85 million, with the core [Pabst Blue Ribbon] brand increasing by 65 [percent]." These undisputed facts contribute but are not necessary to our finding of business situs.

[14]    In making these arguments, the trusts criticize the FTB's argument that section 17952 does not apply to "business income" and its use of that phrase, stating "it is unclear whether it[ ] means income derived from a trade or business generally or income apportioned under the Corporation Tax Code specifically." They say "[n]ot all income attributable to a trade or business is necessarily 'business income,' as that term is defined under the Corporation Tax Code." Amicus California Taxpayers Association likewise criticizes the FTB's use of the phrase "business income," suggesting that the phrase "income derived from conducting a business" as used in the regulation differs from the Uniform Act's definition of business income. As we understand the FTB's position, apportionable business income from a unitary corporation— even if derived from an intangible—is not geographically sourced under section 17952, and we agree: under the Uniform Act, even income from an intangible will constitute business income within that scheme as long as " 'the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.' " (*Hoechst Celanese*, *supra*, 25 Cal.4th at p. 518; § 25120.)

that the specific allocation of all income from intangibles to a single situs is not a useful division-of-income method for unitary businesses. (*Mobil Oil Corp. v. Commissioner of Taxes of Vermont* (1980) 445 U.S. 425, 445 [observing that the maxim *mobilia sequuntur personam*, describing "fictions of situs, . . . 'states a rule without disclosing the reasons for it' "].) *Mobil Oil* recognized "that 'the reason for a single place of taxation no longer obtains' when the taxpayer's activities with respect to the intangible property involves relations with more than one jurisdiction." (*Ibid.*) It stated, "Even for property or franchise taxes, apportionment of intangible values is not unknown." (*Ibid.*) "Moreover, cases upholding allocation to a single situs for property tax purposes have distinguished income tax situations where the apportionment principle prevails." (*Ibid.*)

For the company in that case, a New York corporation with its principal place of business in New York engaged in an integrated petroleum business (*Mobil Oil Corp. v. Commissioner of Taxes of Vermont*, *supra*, 445 U.S. at pp. 447-428), the court said: "The reasons for allocation to a single situs that often apply in the case of property taxation carry little force in the present context. Mobil no doubt enjoys privileges and protections conferred by New York law with respect to ownership of its stock holdings, and its activities in that State no doubt supply some nexus for jurisdiction to tax. [Citation.] Although we do not now presume to pass on the constitutionality of a hypothetical New York tax, we may assume, for present purposes, that the State of commercial domicile has the authority to lay some tax on appellant's dividend income as well as on the value of its stock. But there is no reason in theory why that power should be exclusive when the dividends reflect income from a unitary business, part of which is conducted in other States. In that situation, the income bears relation to benefits and privileges

36

conferred by several States.  These are the circumstances in which apportionment is ordinarily the accepted method.  Since Vermont seeks to tax income, not ownership, we hold that its interest in taxing a proportionate share of appellant's dividend income is not overridden by any interest of the State of commercial domicile." (*Id*. at pp. 445-446.)  In *Mobil Oil*, there was no risk of multiple taxation because Vermont had the right to tax only a portion of the dividend income.

Nor do we glean a 100 percent allocation rule from regulation 17952, stating that where intangible property has a business situs in this state, the "entire income from the property" is income from sources within this state. The regulation speaks to the entirety of the income, not the entirety of the goodwill.  Its plain terms does not reflect a rule of 100 percent allocation.  We will not extend its language by implication to make such a rule.  (*926 North Ardmore Ave., LLC v. County of Los Angeles*, *supra*, 3 Cal.5th at p. 328.)  In the face of any ambiguity on the point, we endeavor to construe the regulation in a manner that avoids doubt about its constitutionality or validity.  (*Young v. Haines* (1986) 41 Cal.3d 883, 898.)  Under these circumstances involving apportionable business income from goodwill, we will not construe the regulation to mandate that income from the entirety of Pabst's goodwill must be sourced to California.

VII. *Arguments of Amicus California Taxpayers Association*

Amicus California Taxpayers Association makes several arguments in support of the trusts' position.  It argues that "business income" and "nonbusiness income" for purposes of the Uniform Act do not denote the character of an item of income, but "define two buckets of a corporation's income that determine whether a corporation's income will be apportioned among several states or allocated to a single state" and with respect to an S

corporation has no bearing on the character of an item passed through to a shareholder. According to amicus, the Uniform Act's "classifications have nothing to do with the underlying income-producing activity that generates an item of income." It reiterates plaintiffs' arguments based on *Valentino, supra*, 87 Cal.App.4th 1284 that the character of an item of income is defined by the underlying source, or income-producing activity, regardless of whether it is business or nonbusiness income. It argues classifying income as business or nonbusiness income in *Valentino* "would not have changed the fact the underlying income-producing activity was the sale of tangible goods." Amicus acknowledges that a nonresident taxpayer is only taxed on the gross income from sources within this state under section 17041, but maintains that statute requires sourcing under the Personal Income Tax Law, sections 17951 through 17955. It argues only section 17952 applies to the trusts' nonresident taxable income, which is derived from goodwill. It argues the character of income (as ordinary income, dividends or goodwill) "does not impact whether the income is business or nonbusiness income" under the Corporation Tax Law.[15] It maintains the FTB's use of the term "business income" blurs the lines between the Personal Income Tax Law and the Corporation Tax Law, showing it has no legislative authority for declining to apply section 17952. Amicus argues *Valentino* requires us to characterize the income as stemming from the sale of intangible personal property—the goodwill—and the trusts must be treated as though they directly sold the

---

15    As to the Uniform Act, Amicus asserts that during 2014, the mechanism for apportioning business income in California was through a single sales factor formula, and for sales factor purposes sales of intangibles are "sourced" under section 25136. Section 25136 simply says that "[s]ales from intangible property are in this state to the extent the property is used in this state." (§ 25136, subd. (a)(2).) The parties do not dispute the propriety of Pabst's apportionment of 6.6 percent of its business income to California.

goodwill in their individual capacities. It argues "California's conformity to [Internal Revenue Code] section 1366(b) is not modified by the Revenue and Taxation Code."

Our conclusions above dispose of these contentions. The last argument disregards the Personal Income Tax Law and Corporation Tax Law's conditional adoption of the Internal Revenue Code provisions. (§§ 17087.5; 23800.) Amicus misapprehends *Valentino*'s discussion of the conduit rule and its focus on the attribution of S corporation business activity to shareholders. The flaw in amicus's characterization of *Valentino, supra,* 87 Cal.App.4th 1284, is that *Valentino* did not involve a unitary business with in-state and out-of-state operations. Cellular 2000's business operations did not require it to characterize its income as business or nonbusiness income, and *Valentino*'s discussion cannot be extended to the characterization and sourcing of unitary business income.

Whether income from intangible property is characterized as business income under the Uniform Act's classifications has everything to do with the nature of Pabst's underlying business activity and thus its proper characterization for purposes of being passed through to shareholders. As stated, income from intangibles becomes business income if it meets a functional test focusing on whether the property is an integral part of those business operations. (*Hoechst Celanese*, *supra*, 25 Cal.4th at pp. 526-527.)

Our conclusions preserve the integrity of the S corporation pass-through regime and give effect to the quasi-legislative regulations specifically adopting Uniform Act apportionment and sourcing rules for nonresident shareholders of unitary corporations such as Pabst. We decline to engage in a construction that would exempt the trusts from tax liability for Pabst's apportioned California business income passed on to them, which would be

39

contrary to the Legislature's directive that nonresidents be taxed on their California source income.

## DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

HALLER, Acting P. J.

DO, J.